*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN ERIC THOMAS, and wife, HEATHER THOMAS,
    *Plaintiffs-Appellants,*

    *v.*

CITY OF CHATTANOOGA, TENNESSEE,
    *Defendant-Appellee.*

No. 03-6308

>

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 02-00228—R. Allan Edgar, Chief District Judge.

Argued: November 4, 2004

Decided and Filed: February 9, 2005

Before: COLE and ROGERS, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Robert J. Shockey, Nashville, Tennessee, for Appellants. Phillip A. Noblett, OFFICE OF THE CITY ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Robert J. Shockey, Nashville, Tennessee, for Appellants. Phillip A. Noblett, Michael A. McMahan, Jennifer T. Flowers, OFFICE OF THE CITY ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. Plaintiffs-Appellants, Eric and Heather Thomas, bring this appeal following the district court's grant of summary judgment in favor of the City of Chattanooga's Police Department in a municipal liability action under 42 U.S.C. § 1983. The appellants claim that the Chattanooga Police Department had a policy, custom, or practice of condoning the use of excessive force against suspects. For the reasons discussed below, we **AFFIRM** the decision of the district court.

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

# I.

## A. The Shooting

On May 28, 2002, at approximately 6:45 p.m., one of Eric Thomas's neighbors called the police to report a disorder at Thomas's home, because Thomas and his father had been loudly arguing. When the police arrived, however, the dispute had been resolved. Later that night, at around 11:30 p.m., Thomas was driving home from a friend's house when the muffler and exhaust pipe fell off his truck. Thomas became upset and continued to drive home, dragging the muffler and exhaust pipe on the street and squealing his tires as he entered his driveway. Thomas entered his house, and he noticed that some of the firearms from his gun collection had been moved from where he left them earlier that day. He went out his side kitchen door, yelling to his wife, Heather, who was next door at her parent's house, "[w]here's all the guns?" She yelled back that his mother had moved them. Heather then returned home, found the guns, and placed them on the kitchen table.

Meanwhile, a neighbor called the police to report a domestic disorder and told the dispatcher that a man and woman were screaming at each other. Officer Abernathy (who knew nothing of the earlier domestic disorder call) was first to respond, and was told by the dispatcher that there was "a guy riding up and down the street in a truck hollering and screaming, burning rubber in the street," and that the man had a baseball bat. Upon arriving at the neighborhood, Officer Abernathy was told by an elderly man in the street that Thomas's house was the scene of the domestic disorder. The officer walked toward Thomas's house and heard two people screaming at each other from inside the house. He radioed for backup and then continued to walk toward the porch. Dogs were barking in the backyard as he entered the porch and he could see into the kitchen through a window in the top half portion of the door.

Officer Abernathy saw a man and woman (Thomas and his wife) facing each other, but he could not hear what they were saying. According to the officer, the man was facing a hallway and the woman was next to the kitchen cabinets. He observed two rifles on the kitchen countertop and saw that the man had a handgun in each hand. The officer saw the man "take a staggered step with his left foot" towards the hallway, and the woman reach for the kitchen door, presumably to unlock it. Officer Abernathy then saw the man begin to turn towards the woman. At this point the officer's vision was partially obstructed. In his deposition, officer Abernathy stated that "[w]hen Mr. Thomas [was] turning to his right, I lost sight of the gun in his left hand which I felt traveled up to a point at her." Officer Abernathy believed that the man and woman had some sort of exchange, and then he saw "Mrs. Thomas start to back up and it looked like she had her hands down to her side." Officer Abernathy claims that the man swayed in the direction of the woman and he saw "an almost surprised expression on her face." At that point, officer Abernathy claims that "there was no doubt in [his] mind, based on her expression and her body language, that she was in imminent danger," and that he was in secondary danger if the man saw him through the window, or knew of his presence because of the loud barking by the dogs. Based on his belief that Eric Thomas was an immediate threat, the officer fired seven continuous rounds through the glass in the kitchen door at Thomas's left arm. Thomas and his wife both claim that they were merely putting away the guns and that Thomas had started to walk away from his wife when he was shot.

Officer Abernathy does not believe that he announced himself as a police officer before the shooting because he did not think there was enough time. It is unclear whether either Thomas or his wife saw the officer on their porch. Officer Abernathy also stated that he did not stop to reevaluate the scene after firing one or two shots because he did not see Thomas drop the guns and thus he believed that the threat had not been subdued. Thomas was hit with seven bullets in his back and in his left arm. Thomas survived the injuries, but is now partially disabled.

## B. The Internal Investigation

The Internal Affairs Division of the Chattanooga Police Department, headed by Captain Janet Crumley, conducted an investigation of the shooting. Based upon her review of Sergeant Russell's investigative report, Crumley determined that the shooting was justified. At the time of the report, Thomas and his wife were unwilling to give Crumley their statements. Crumley noted the relevant facts in the report, but included that officer Abernathy *had* issued a verbal warning through the closed door. Crumley concluded that "Officer Abernathy fired his weapon to protect Heather Thomas from what he reasonably believed to be an imminent threat of serious bodily harm or death," and that "[h]is actions were in compliance with Department Policy." Crumley's determination was reviewed and approved by the Chief of Police. Upon later questioning, Crumley was told that officer Abernathy might not have announced himself or issued a warning prior to shooting Thomas. Crumley maintained that the shooting was justified because the facts still indicated that officer Abernathy perceived Thomas as an immediate threat to his wife. In her deposition, Crumley was asked how she would decide, hypothetically, ten separate cases that were each identical to Thomas's situation, and Crumley responded that she would decide each case the same way she decided this case.

Eric and Heather Thomas did not sue officer Abernathy in any capacity; rather, they chose to sue the Chattanooga Police Department under a municipal liability theory. The City of Chattanooga moved for summary judgment against the Thomases. In response, the Thomases relied on affidavits from their expert witness, Phillip Davidson, who had experience with police operations. The City supported its motion with three affidavits from police officials familiar with the Department's policies and practices. All of these officials denied the existence of any policy in the Department condoning the use of unlawful excessive force. The district court determined that the plaintiffs had not presented a genuine issue of any material fact and granted the City's motion for summary judgment.

## II.

## A. Municipal Liability Under § 1983

We apply a *de novo* standard in reviewing the district court's grant of summary judgment. *McClean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Summary judgment is proper where the movant shows through "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmovant must rebut such a showing by presenting sufficient evidence on which the jury could reasonably find for him; "[a] mere scintilla of evidence is insufficient" to meet this burden. *McClean*, 224 F.3d at 800. "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *Id.*

Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law. 42 U.S.C. § 1983. To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.*

There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal

rights violations.  *Id*.; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996).

In the present case, the Thomases alleged that the City of Chattanooga had an unwritten policy, practice, or custom of condoning the use of excessive force against potential suspects.  In *Doe*, this Court articulated the requirements for a municipal liability claim made on the basis of an "inaction theory," where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched.  We stated that, under such a theory, the plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Doe*, 103 F.3d at 508.

The City of Chattanooga moved to dismiss the Thomases' claim on the theory that the Thomases had failed to present a genuine issue of material fact indicating that the Police Department had a policy or custom of condoning the excessive use of force.  The City relied primarily on three affidavits from Sergeant Charles Russell, Captain Mike Williams, and Lon Eilders.  Sergeant Russell, of the Internal Affairs Division, stated that there have never been any complaints of excessive force against officer Abernathy, that the Department did "not have any policy, custom or practice allowing police officers to use excessive force on any suspect," and that "no policy-making official of the City has ever authorized or condoned any policy or custom of using excessive force." Captain Williams, who is in charge of the Chattanooga Police Department Training Division, stated that officer Abernathy received proper training regarding use of deadly force; that to his knowledge, the City "did not have a policy, custom or practice of training its police officers to use deadly force on any suspect unless the officer clearly believed deadly force was immediately necessary"; and that the City has never authorized or condoned excessive force, nor did it fail to train its officers due to any "deliberate indifference."  Finally, Mr. Eilders, who manages the Accreditation and Standards for the Police Department, stated that he is "familiar with the customs and practices within the Police Department as they existed in May of 2002," and that it did not have a policy, custom or practice of allowing its officers to use unwarranted excessive force.

In rebuttal, the Thomases presented affidavits from their witness, Phillip Davidson, regarding the Police Department's practice of condoning the use of excessive force by its officers.  Davidson's first affidavit was two pages and the relevant portion in its entirety stated:

> Based on my experience with other cities in cases similar to this one, the number of formal civil cases alleging use of excessive force by police officers filed against the City of Chattanooga indicates that . . . Chattanooga Police Department uniformed officers acted within an informal, unwritten policy, practice, or custom wherein the unlawful use of force–the use of excessive force–was tolerated.  In my experience, this "culture" must necessarily have been known to Chattanooga Police Department . . . illustrated by the fact that [Crumley] recommended that Officer Abernathy's shooting of Mr. Thomas be "...carried as justified."

A few days later, Davidson submitted a second affidavit, which essentially reiterated his first affidavit and added that he had reviewed statistical evidence, consisting of some of the complaints

and civil cover sheets from the forty-five suits filed against the Chattanooga Police Department alleging use of excessive force since July of 1994. Davidson had not examined the details of any of these suits beyond merely looking at the complaints. Finally, in a supplemental affidavit, Davidson stated that he inferred a policy, practice, or custom of condoning excessive force in the Police Department based on the fact that officer Abernathy was found justified in shooting Thomas, and that Crumley stated in her deposition that she prepared her investigative report in the "customary way," and would have decided the case the same way if she had to do it over again. Davidson essentially argued that there must have been a policy or custom of condoning excessive force in the Chattanooga Police Department because there had been several complaints of excessive force against the Department in the past, and because here, in Davidson's opinion, officer Abernathy had violated the Department's written "use of force" policy and yet his actions were deemed justified by the Department.

### 1. The Previous Complaints Against the Department as Evidence of a "Policy"

The district court determined that Davidson's inference that the Police Department had an unwritten policy condoning excessive force was conclusory, because Davidson never "set forth the basis or reasoning behind his opinion." The civil complaints which Davidson evaluated ranged from a shooting to a broken fingernail, but Davidson did nothing to inform the court as to whether most of the complaints were serious or frivolous. Davidson also failed to explain how one could evaluate the mere number of complaints in a vacuum to come to a conclusion about the Department's policies. Moreover, Davidson failed to present any "data upon which the Court could compare or contrast the number of excessive force complaints made by citizens of Chattanooga with the number of excessive force complaints in similarly-sized cities or in cities with a similarly sized police force." We agree with the district court's finding that Davidson's opinion was conclusory because he did not explain how he drew his conclusions from the list of complaints made against the Department.

First, appellants argue that the lower court improperly dismissed Davidson's testimony because the court disagreed with Davidson's conclusion that the number of complaints against the city in and of themselves demonstrated an unwritten policy of condoning excessive force. Appellants point to a portion of the district court's opinion which states that "if the Chattanooga Police Department finds a complaint of excessive force to be justified or well-founded approximately every 10 months, it obviously does not have a policy of denying all excessive force claims or sweeping them under the carpet." Although this type of assumption by a district court would not be appropriate, given the context of the opinion, it is clear that the court was not disagreeing with Davidson's expert opinion; rather, the court was pointing out that the statistics upon which that opinion was based are meaningless because Davidson did not produce any data showing what a "normal" number of excessive force complaints would be. Consequently, we find that the court did not disagree with Davidson's conclusion; it simply could not accept the basis behind it.

Next, appellants argue that the court made a negative credibility determination regarding Davidson–an issue that should have survived summary judgment and gone to a jury. This argument misunderstands the district court's opinion. The court did not make a credibility determination because the issue was not Davidson's credibility; the issue was whether Davidson could substantiate his opinion where necessary.

This argument brings us to the crux of appellants' case. Appellants argue that, based on Davidson's vast expertise and experience alone, the district court should have denied summary judgment because Davidson surmised that there must have been an unwritten policy of condoning excessive force. Additionally, appellants argue that because this case does not involve a "hard

science," the traditional *Daubert* factors,[1] which the courts use to evaluate the reliability of an expert's testimony, are not readily applicable.

To some degree, appellants are correct. The Supreme Court has held that the principles articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), apply to "all expert testimony," although the lower courts have flexibility in the application of the factors, because it may not make sense to apply some of the *Daubert* factors, such as the rate of error analysis, to non-scientific testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). In this case, appellants believe that because we are dealing with non-scientific testimony, Davidson may rely solely on his experience to explain the conclusion he drew from the number of complaints filed against the Police Department, rather than having to explain to the court why and how he came to those conclusions. An expert may certainly rely on his experience in making conclusions, particularly in this context where an expert is asked to opine about police behavior. *See* FED. R. EVID. 702 advisory committee's note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.") We need not doubt whether Davidson is qualified to assess police operations. Indeed, Davidson's curriculum vitae suggests that his long career in the fields of criminal justice, the law, and education have all related to police training and operations.

However, being an expert does not lessen the burden one has in rebutting a motion for summary judgment. In fact "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *See* FED. R. EVID. 702 advisory committee's note. When *Daubert* was remanded back to the Ninth Circuit, the court stated that "[w]e've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough." *Daubert*, 43 F.3d 1311, 1319 (9th Cir. 1995). Similarly, in this case, because Davidson's affidavits provide no rationale for his conclusions, appellants are asking that we take their expert's "word for it." We cannot. Davidson himself stated that "there's no bright line or rule" regarding how many complaints would be excessive, suggesting that an expert would need to conduct a more qualitative analysis. However, Davidson did not conduct such an analysis, and instead, in his deposition he merely mentioned a few cases where the courts have let the jury determine whether the municipality had an unwritten illegal policy. Even then, Davidson offered no qualitative analysis of those cases and how they were similar to the present case. Therefore, Davidson's conclusion, that the Police Department must have an unwritten policy of condoning excessive force because of the mere number of complaints previously filed against it, is insufficient to create a genuine issue of material fact on which a jury could reasonably find that such a policy exists.

### 2. The Shooting and the Resulting Investigation as Evidence of a "Policy"

Appellants also argue that Davidson partially based his conclusion on the fact that Thomas was shot in violation of Department policy, and the internal investigation nonetheless determined the shooting to be justified. There is potentially a real question as to whether officer Abernathy was justified in shooting Thomas. But this question is not before us. The question here is whether there was some sort of policy, custom, or practice in the Chattanooga Police Department of condoning excessive force, and under *Doe*, such a policy must be shown by a clear and persistent pattern. 103

---

[1]The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-97 (1993) listed several factors which the lower courts should consider in determining the reliability of scientific evidence, including: whether the theory can be reliably tested; whether it has been subject to peer review; what the theory or test's potential rate of error of is; whether there are standards controlling the test's operations; whether the theory or test is generally accepted; and whether the expert conducted the work independent of litigation.

F.3d at 508. The danger in appellants' argument is that they are attempting to infer a municipal-wide policy based solely on one instance of potential misconduct. This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard. This path to municipal liability has been forbidden by the Supreme Court. *Monell,* 436 U.S. at 694; *cf. Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (holding that a municipality was not liable for its hiring decision where the employee later went on to use excessive force against plaintiff because the plaintiff failed to demonstrate that the municipality directly caused the injury through its own deliberate action). Thus, without showing more than officer Abernathy's potentially excessive use of force in this particular case, Thomas cannot survive summary judgment.

Appellants' best argument is that the Department has a custom of mishandling investigations of excessive force complaints. Davidson contends that the shooting of Thomas and the Department's treatment of Thomas's case is itself proof that it had an unwritten policy of failing to discipline its officers when they use excessive force against suspects. Davidson stated that "[i]n my opinion, Captain Crumley's report provides a clear insight into the Chattanooga Police Department's 'customary' method of preparing excessive force reports," and that, in his opinion, officer Abernathy violated the Department's written "use of force" policy.

It is debatable whether the Police Department properly deemed this shooting "justified." However as the district court noted, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . ." (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

All this aside, appellants must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the shooting here. *See Doe*, 103 F.3d at 508. Davidson's analysis focused mainly on the "deliberate indifference" aspects of this case.

As this Court noted in *Doe*, deliberate indifference "does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious, deliberate indifference" to the alleged violation. *Id.*; *Bd. of County Comm'rs of Bryan County*, 520 U.S. at 407 (holding that deliberate indifference cannot be met by a "showing of simple or even heightened negligence"). The *Doe* Court found that even where a school board had some information that one of its teachers may have sexually abused students in the past and the board failed to remove him before he abused the plaintiff, the school board could not be found liable for having a policy, custom, or practice of condoning such abuse because there was no evidence that the school board failed to act regarding other teachers in similar circumstances; thus there was no evidence of any deliberate pattern. *Id.* at 508. *Doe* makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference.

Despite the extreme circumstances here, appellants have not met their burden of showing that there is a genuine issue of whether an illegal Police Department policy exists. Appellants' expert inferred an illegal municipal policy from the Department's potentially insufficient investigation of Thomas's case, just as the plaintiff in *Doe* attempted to infer an illegal municipal policy from the school board's failure to remove the dangerous teacher at issue. Appellants' expert did not reach beyond the facts of this case to show any possibility of a pattern. Appellants point to this Court's finding in *Leach v. Sheriff of Shelby County*, 891 F.2d 1241 (6th Cir. 1989), in support of the notion that deliberate indifference can be demonstrated by a municipality's failure

to adequately investigate claims. However, in *Leach*, this Court was convinced that the municipality had a policy of deliberate indifference to prisoners' medical needs based on the fact that there were several separate instances where the prison failed to investigate prisoner mistreatment. 891 F.2d at 1246-48 (noting that the lower court found that "at least 14 other paraplegics had received similar deplorable treatment"). Unlike the plaintiffs in *Leach*, appellants have failed to show several separate instances of the alleged rights violation. Furthermore, the fact that Crumley stated that she would find officer Abernathy "justified" in his shooting if she had to make the same decision again, does not show a pattern of deliberate indifference that goes beyond the facts of appellants' own case. Rather, Crumley's statement was about a hypothetical situation that was based entirely on the facts of Thomas's own case. Therefore, appellants' argument falls prey to the problem of collapsing the municipal liability standard into a *respondeat superior* standard.

Because Davidson failed to provide any explanation for his reliance on the mere number of excessive force complaints against the Police Department, the basis of his opinion has been reduced to the facts of Thomas's case. These facts fall short of proving deliberate indifference by the municipality.

## III.

For the reasons stated above, we hereby **AFFIRM** the judgment of the district court.