NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0138n.06

No. 16-5272

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 03, 2017
DEBORAH S. HUNT, Clerk

WILMER PAYNE, )
      )
     Plaintiff-Appellant, )
      )
v. )    ON APPEAL FROM THE
      )    UNITED STATES DISTRICT
SEVIER COUNTY, TENNESSEE, )    COURT FOR THE EASTERN
      )    DISTRICT OF TENNESSEE
     Defendant-Appellee. )
      )
      )

Before: CLAY, KETHLEDGE, and DONALD, Circuit Judges.

KETHLEDGE, Circuit Judge. Wilmer Payne was incarcerated at the Sevier County Jail, where he received medical treatment from First Med, Inc., a County-hired healthcare contractor. In June of 2013, Payne began complaining of tooth pain, headaches, and nosebleeds. First Med suspected he had an infected tooth and treated him with antibiotics. Over the next four months, however, Payne failed to get any better, despite the medication. First Med then sent him for a CT scan, which revealed he had oral cancer rather than an infection. Payne thereafter sued the County under 42 U.S.C. § 1983, arguing that First Med's medical personnel and the County's correctional officers had been deliberately indifferent to his serious medical needs, and that the County was responsible for that indifference. The district court granted summary judgment to the County. We affirm.

I.

On March 29, 2013, Payne arrived at the Sevier County Jail to serve a 39-week sentence for misdemeanor domestic assault. Three months later, on June 7, Payne filed an Inmate Sick Call Request, complaining of a toothache. Virginia Mason, one of First Med's licensed practical nurses, responded, informing him that he had been added to the roster of inmates slated to see First Med's dentist. For the next month and a half, Payne waited without hearing anything about a dental appointment. On July 23, Payne filed a grievance with the prison, demanding that he be seen immediately because his pain had "intensified unbearably." The correctional officer who received the grievance, Lieutenant Loveday, sent it to First Med.

The next day, another LPN, Amy Williams, conducted the first of what would be nine examinations of Payne by First Med. She observed that his lower right jaw was "slightly red with [a] yellow raised area." Williams suspected that Payne had an infected tooth and prescribed penicillin. Payne soon filed another Inmate Sick Call Request, reporting that his gums were red and swollen, and that his nose would not stop bleeding. Another LPN, Susan Peterson, examined Payne; finding no evidence of redness, swelling, or nosebleeds, she denied his request for pain medication. Payne continued to receive antibiotics.

Two days after seeing Peterson, Payne filed a second grievance against First Med, complaining of cranial pressure, blurred vision, and difficulty swallowing. Again, Loveday forwarded the grievance on to First Med. LPN supervisor Jessie Timbrook responded to Payne in writing, reiterating that Peterson had found nothing unusual during her examination, and promising that Payne would see First Med's dentist the next time he visited the jail. Payne asked Loveday why Loveday had not responded to Payne's grievance himself. Loveday replied that he

was "overwhelmed" by other responsibilities and therefore "too busy" to address Payne's grievance.

Two weeks later, Williams and First Med's dentist, Dr. Daniel Roberts, each examined Payne. During Williams's exam, she observed a "raised pocket" on the roof of Payne's mouth. Roberts did not document what he observed, but he prescribed another cycle of penicillin and three days' worth of ibuprofen. Two days later, Payne asked to see Roberts again because he was still suffering from tooth pain, headaches, and nosebleeds. The next day, Payne made a request for more pain relievers, which First Med denied.

On September 12, another LPN, Sheri Cable, conducted First Med's fifth examination of Payne. She observed that his palate was still swollen, and prescribed him a new antibiotic. Six days later, First Med's physician's assistant, Tim Thomason, examined Payne. He found a lesion on Payne's palate, switched Payne's antibiotic a second time, and prescribed him an antiseptic mouth wash. On September 25, Payne visited Roberts a second time. Again, nothing in the record reveals what, if anything, the dentist found. That same day, however, First Med scheduled Payne for a CT scan of his face and neck, to be taken October 7.

On October 1, Payne filed his third grievance against First Med, complaining that he had not gotten any better despite the treatment he had received. Loveday again passed the complaint along to First Med. Another LPN, Dan Hartley, saw Payne twice in the next week. During the two visits, Hartley observed the following: a "right next mass," an "oral lesion," and "prominent swelling with pockets of what appeared as white flesh or pus" inside Payne's nasal cavity. Hartley thought Payne might have a tumor, and told Thomason and Timbrook what he had found.

Timbrook then responded to Payne's October 1 grievance, stating that First Med had examined Payne multiple times, prescribed him antibiotics and pain medication, and scheduled him for imaging. Payne responded by filing a fourth grievance, listing his symptoms and accusing First Med of "dragging [its] feet" in treating him.

Payne had his CT scan on October 7. Three days later, First Med received the results, which confirmed that Payne had an "aggressive soft tissue mass" in his nasal cavity that was "indicative of malignancy, possibly squamous cell carcinoma," a form of cancer. An unidentified First Med employee faxed the results to Thomason. Over the next five days, no one at First Med examined Payne or informed him what the scan had revealed. Payne then filed a fifth grievance on October 15, demanding to see the results for himself. That same day, he began experiencing uncontrollable nosebleeds, and First Med sent him to the emergency room. There, an ER doctor told Payne for the first time that, according to the CT scan, he likely had cancer. Payne was released early from prison, and has been receiving cancer treatment ever since.

Payne thereafter brought this suit under 42 U.S.C. § 1983, claiming that the County, First Med, and individual employees of both entities had violated his Eighth Amendment right to medical care in jail. First Med and its employees reached a settlement agreement with Payne, but the County and its employees did not; instead, they moved for summary judgment. The district court granted the County's motion, holding that Payne had not identified any County custom or policy that had caused his injuries.

II.

We review the district court's grant of summary judgment de novo. *Smith v. City of Wyoming*, 821 F.3d 697, 706 (6th Cir. 2016).

To bring a successful § 1983 suit against the County, Payne needed to prove not only that employees of the County or First Med had been deliberately indifferent to his serious medical needs, but that their indifference was directly caused by a County custom or policy. *Baynes v. Cleland,* 799 F.3d 600, 620-21 (6th Cir. 2015).

Here, the question is whether Payne has presented evidence creating a genuine issue as to whether a County custom or policy caused First Med's medical staff to treat him with deliberate indifference. Payne argues that he has identified both a custom and a policy that harmed him.

For § 1983 purposes, a "custom" is a "practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled" as to have the force of law. *Cash v. Hamilton Cty. Dep't of Adult Prob.*, 388 F.3d 539, 543 (6th Cir. 2004). A plaintiff cannot establish a custom solely by pointing to the facts of his own case. Instead, he must "reach beyond" the alleged misconduct at issue, and show "several separate instances" of similar misconduct. *Thomas v. City of Chattanooga*, 398 F.3d 426, 433-34 (6th Cir. 2005).

The custom that harmed Payne here, he says, is the County's alleged practice of forwarding grievances against First Med to First Med itself. But Payne submitted no evidence that the County followed that putative custom when dealing with inmates other than Payne. Indeed, Payne's only proof were his own five grievance forms, all submitted within a three-month window. Per our decision in *Thomas*, five instances of alleged misconduct, over three months, all involving the plaintiff himself is not enough to prove a custom. 398 F.3d at 433-34. Moreover, as Payne himself points out, Lieutenant Loveday allegedly said that he forwarded

Payne's grievances to First Med because he was "too busy" to address them himself. That suggests that the handling of Payne's grievances was due more to Loveday's personal circumstances than to a widespread custom. Payne has therefore failed to raise a genuine dispute that a custom caused his injuries.

Payne also argues that he was harmed by one of the County's written policies. For § 1983 purposes, not every directive issued by a county official constitutes a "policy." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Instead, a policy must either be facially unconstitutional or reveal that policymakers were deliberately indifferent to the rights of those affected by the directive. *Id.* at 406-07. To establish deliberate indifference, a plaintiff generally needs to show that the policy has resulted in "prior unconstitutional actions," but that policymakers have maintained the policy nonetheless. *Miller v. Calhoun Cty*., 408 F.3d 803, 815 (6th Cir. 2005). In rare circumstances, however, a plaintiff can prove indifference simply by showing that a policy's "unconstitutional consequences" should have been "patently obvious" to the county. *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

According to Payne, the policy that harmed him is the County's alleged practice of letting LPNs diagnose and treat inmates without any supervision from a doctor. That is a problem, Payne contends, because LPNs are not trained to diagnose and treat ailments on their own. As a threshold matter, the purported policy is not facially unconstitutional. Just like a statute, a county policy is facially unconstitutional only if "the [policy] is unconstitutional in all of its applications." *Cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). And unsupervised LPNs can—and presumably often do—provide constitutionally adequate medical care. Thus, to establish that the County's use of LPNs constitutes a policy, Payne needed to prove that the practice amounts to deliberate indifference.

Payne has not made that showing. He presented no evidence that the LPNs provided subpar treatment to anyone but him. He therefore failed to demonstrate a pattern of "prior unconstitutional actions" caused by the purported policy. *Miller*, 408 F.3d at 815. Nor did he show that the County's use of LPNs would obviously result in Eighth Amendment violations. Again, to violate the Eighth Amendment, a medical professional must act with deliberate indifference, meaning that she must recognize and consciously disregard a substantial risk to an inmate's health. *Wallin v. Norman*, 317 F.3d 558, 562 (6th Cir. 2003). Payne has failed to present evidence that the County's putative policy would cause LPNs to act with that kind of indifference. He has therefore failed to prove the existence of a County policy that harmed him.

\* \* \*

The district court's judgment is affirmed.

BERNICE BOUIE DONALD, Circuit Judge, concurring. While I agree with the majority that Mr. Payne has not made the requisite showing to support a finding of *Monell* liability, I find it necessary to emphasize that this rule does not allow, nor does this Court condone, a municipality attempting to escape its constitutional duties by hiring a contractor to provide a fundamental service without supervision.

Mr. Payne argues that because Sevier County's duty to provide adequate medical care to its inmates is non-delegable, it maintains responsibility for constitutional deprivations caused by its medical contractor's policies or customs. In making this argument, Mr. Payne relies on *Ancata v. Prison Health Services, Inc*, an Eleventh Circuit decision, in which the Court states in dicta that the county "remains liable for any constitutional deprivations caused by the policies or customs" of the medical contractor. 769 F.2d 700, 705 (11th Cir. 1985). To refute this argument, Defendant Sevier County argued in briefing and at oral argument that a municipality may only be liable for the decisions of a contractor where the municipality "officially abdicated its right to review and influence the subordinate's decisions." Appellee Br. 21 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483). Sevier County asserts that under this rule, even where the municipality "granted an actor wide discretion to perform a duty and was lax or even negligent in it supervision," it will not be liable unless it has delegated its policy-making authority. *Id.*

Sevier County is correct that "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality op). However, this precedent does not absolve municipalities of liability for actions of contracted medical providers. Nor does it relieve municipalities of their constitutional responsibilities as completely as Sevier County has argued

here.  A municipality may be liable for the decisions of a contractor not only where a supervising policymaker "expressly approved" a decision by a subordinate that was "cast in the form of a policy statement," but also where "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware."  *Praprotnik*, 485 U.S. at 130 (citations omitted).  As the majority opinion makes clear, Mr. Payne has not made a requisite showing that either a custom or policy attributable to Sevier County caused his injury.  However, this opinion should not be read to shield a municipality that attempts to discharge its constitutional duties by hiring contractors to provide fundamental services to those in the municipality's care and then placing its head in the sand to remain oblivious to violations.