NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0384n.06

No. 20-6067

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 16, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| FLORA JANE MCGUIRE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| CITY OF SWEETWATER, TENNESSEE, | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |

---

**BEFORE:** **STRANCH, BUSH, and READLER, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.** In early 2018, Flora Jane McGuire, an employee of the City of Sweetwater, attempted to raise concerns about a proposed rezoning at various public meetings. She alleges that City officials warned her not to repeat her complaints, tried to prevent her from speaking at a meeting of the Board of Commissioners, attempted to have her fired, and ultimately gave her the option to be terminated or to resign with certain benefits. McGuire resigned and brought this lawsuit against the City for alleged violations of her First Amendment rights and Tennessee law. The district court granted summary judgment dismissing her § 1983 claim because McGuire failed to establish that the City officials involved were final policymakers such that the City could be held liable for their actions. The court dismissed her state law claims without prejudice. We **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

McGuire was employed by the City of Sweetwater as the Director of two municipal programs: Sweetwater Valley Citizens for the Arts and Sweetwater Main Street. She was supervised by Scott Wilson, the appointed Director of the Sweetwater Planning, Development and Tourism Department (the Department) and liaison between the Department and the City's Planning Commission. Wilson, in turn, reported to Sam Moser, an elected member of the City's five-member Board of Commissioners. Moser oversees the Department and serves as the Board's designated Personnel Commissioner.

According to the City, from May 2017 to May 2018, McGuire was involved in a number of conflicts with City employees and members of the public. In 2018, for example, McGuire learned that the City was considering a proposal by the Kirkland family to rezone a tract of land (the Hall property) in her neighborhood from residential use to commercial use. Wilson, who also worked as a private real estate agent to supplement his income, was at that time representing the Kirklands in their attempt to sell a separate piece of property.

McGuire opposed the rezoning and voiced this objection at the January 23, 2018, meeting of the City's Planning Commission. Because a quorum was not present, the Commission took no formal action. After the meeting, McGuire discussed the issue with her neighbors and encouraged them to attend the next meeting and call the Commissioners. McGuire also used her City email account to contact Monroe County Planning Director Ruth Hawk during City business hours to discuss the zoning.

McGuire appeared again at the February 19 meeting of the Planning Commission, at which Moser (a voting member) and Wilson were present, to repeat her views on the rezoning application. She also said that Wilson had a conflict of interest because he represented the Kirklands. Because

Moser was a potential architect for the Kirklands' project, he recused himself from the vote, and he and Wilson left the meeting. The Planning Commission voted to recommend approval of the rezoning to the Board of Commissioners. Wilson eventually withdrew from representing the Kirklands in the other transaction.

A few days after the Planning Commission vote, Jessica Morgan—the City Recorder and Human Resource Officer—came to McGuire's office. According to McGuire, Morgan told her to "back off" her claims that Wilson had a conflict of interest and that she could be fired for her comments because it could constitute defamation or insubordination.

McGuire asked Morgan to place her on the agenda for the upcoming March 5 meeting of the Board of Commissioners. Morgan told McGuire that the Board's policy required citizens first to meet with the Department Head and Commissioner relevant to the issue, and then to attend a workshop with the Board, before they could appear at an actual Board meeting.[1]

McGuire then met with Morgan, Wilson, and Moser. According to McGuire, Moser told her at this meeting that the Municipal Technical Advisory Service had told the City that Wilson had no conflict of interest because he represented the buyers of the Hall property rather than the sellers. McGuire responded that an attorney she had consulted believed Wilson's participation was, in fact, a violation of the City's Code of Ethics, and, according to McGuire, Wilson "became irate" and "yelled at [her] so loudly another employee heard it across the hall." McGuire also says that she provided other, general reasons for opposing the rezoning, after which Morgan told her

---

[1] McGuire contends in her brief that she "addressed the board several times throughout her career but was never required to follow this process." That is not supported by the record. All McGuire stated in the cited portion of her deposition was that she had previously spoken at Board meetings "for some Main Street things"; she did not say she was not required to follow the agenda policy. The agenda policy, moreover, applied to citizens seeking to speak at Board meetings, and nothing in Morgan or McGuire's testimony suggests that the policy was meant to apply to City officials or employees who were presenting on their work.

she had made a good point and said "[t]hat's what you should say [to the Commission]." Morgan testified that McGuire had replied "You don't tell me what I speak about tonight" and pointed her finger at Morgan.

After this meeting, McGuire attended a Board "workshop," where she spoke about the rezoning but did not repeat her allegations that Wilson had a conflict of interest. She also attended the next Board meeting, on March 5, but did not speak. The Board called a preliminary vote on the rezoning application and it passed.

The final vote was scheduled for April 2. McGuire did not repeat her opinion on the substance of the rezoning application. But another citizen, Patricia Richardson, complained that the City had not provided sufficient advance notice to the public about the proposal, and McGuire agreed. Moser said he was "offended" at the claim that the Commission had not provided proper notice.

After the meeting, Morgan suspected McGuire had coordinated with Richardson, and searched McGuire's e-mail for confirmation. She learned that Richardson had e-mailed her proposed comment to McGuire, who had responded with approval and specific feedback. She also found McGuire's earlier e-mails to Ruth Hawk. Wilson testified that around the same time, he was finding it difficult on a personal level to work with McGuire, and was receiving complaints from other City officials about her conduct and attitude.

According to Wilson, he concluded that McGuire was no longer "suited for the position." Because he understood that he did not have authority to fire her, Wilson approached Morgan, Moser, and John Cleveland, the Sweetwater City Attorney, to determine the next steps. Morgan and Wilson testified that Cleveland prepared a memo laying out various instances of McGuire's alleged failure to fulfill her job responsibilities, and recommending that McGuire be terminated

for cause. McGuire was up for reappointment that July. Morgan contacted each of the Commissioners individually to ask whether they thought McGuire should be retained and if not, whether she could offer McGuire the opportunity to resign early but keep her benefits for a few more months. According to Morgan, each of the Commissioners indicated, either directly or indirectly, that he intended to vote against continuing McGuire's employment.

On May 2, 2018, Morgan, Moser, and Wilson met with McGuire and read her the "Internal Memo" that Cleveland had prepared, which was addressed to the Planning, Development & Tourism Department Head, Planning Department Commissioner, and City Recorder. McGuire recalled being offered three options: be terminated immediately; resign immediately but retain her health insurance for a few months and have her vacation days paid out; or stay on until the end of the budget year, when the Board would decline to renew her position. Morgan testified that she told McGuire that "it was the recommendation of the city attorney to terminate her and that [they] believed the city board was going to vote to terminate her." Morgan said that she gave McGuire two options: either resign immediately and keep her health insurance for a period of time, or leave it "up to the city board," whose members "had said [it] was their intent" not to continue McGuire's employment. Morgan also recalled instructing McGuire to surrender her keys, phone, and iPad, though McGuire did not mention this in her complaint or deposition. McGuire tendered her resignation the next day.

### B.     Procedural History

McGuire filed her complaint on January 8, 2019, followed by an amended complaint on April 1. She asserted First Amendment prior restraint and retaliation claims under § 1983, as well as state law claims under the Tennessee Public Protection Act and the Tennessee Public Employees Political Freedom Act.

The City moved for summary judgment on March 27, 2020 and McGuire cross-moved for summary judgment the next day. On August 17, the district court denied McGuire's motion and granted the City's motion, dismissing McGuire's federal claims with prejudice and her state law claims without prejudice. McGuire has refiled her state law claims in state court, and timely appealed the dismissal of her federal claims.

## II.   ANALYSIS

The district court dismissed McGuire's federal claims because she had failed to show that Moser, Wilson, Morgan, and Cleveland were final policymakers, as required to hold the City liable for their actions in connection with McGuire's termination. On appeal, McGuire argues that Moser, Morgan and Cleveland were final policymakers with respect to her termination as well as to a range of other allegedly retaliatory actions by those City officials. In addition, both McGuire and the City contend they are entitled to summary judgment on the merits of all of McGuire's claims.

### A.   Standard of Review

This court reviews the district court's grant of summary judgment de novo. *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.

### B.   Applicable Law

A municipality "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). It may be held liable only if the alleged violation "occurred because of a municipal policy or custom." *Jones v. Clark Cnty.*, 959 F.3d 748, 761 (6th

Cir. 2020) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). One way to show such a policy is by demonstrating that the relevant actions were taken by officials with final policymaking authority in that specific area. *Id.* Whether a particular official or body is a final policymaker is a question of law to be resolved by the court. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Ordinarily, state and local law determine whether a municipal official has final policymaking authority, *Jones*, 959 F.3d at 762 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)), but the court may also look to "custom or usage having the force of law," *Jett*, 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1)). Final policymaking authority may be delegated. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). However, "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Id.* (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)); *see also Praprotnik*, 485 U.S. at 126. Where a final policymaker affirmatively ratifies the action of a subordinate, however, the municipality can be held liable. *Feliciano*, 988 F.2d at 656 (citing *Praprotnik*, 485 U.S. at 127).

### C.    McGuire's Claims

Municipal law is the starting point in determining the identity of the final policymakers with respect to McGuire's claim of constructive discharge. *See Jones*, 959 F.3d at 761. The Board of Commissioners, together with the Mayor, constitute the governing legislative body of the City. City Charter Art. IV, § 1. That body acts by ordinance or resolution, passed by "an affirmative vote of a majority of the board present and voting"; the Mayor or Vice-Mayor (or other designated

member of the Board) serves as presiding officer, and has no vote except in the event of a tie.[2] *Id.* at Art. V §§ 3, 4.

The Board has the authority to create offices and positions of employment "as deemed necessary for the efficient operation of the city," and all employees occupying these positions "serve at the will and pleasure of the board." City Charter, Art. VII, § 3. The Charter directs the Board to "adopt personnel rules and regulations to govern the hiring, discipline and dismissal of employees" and to "define the other practices and procedures as necessary to the administration of a city personnel system." *Id.* "In adopting personnel rules and regulations, the board may delegate all or any part of its personnel authority." *Id.*

Pursuant to the Charter, the Board enacted the Sweetwater Municipal Code. The Municipal Code creates the office of the City Attorney, and grants its holder the power to: "draft and/or review and revise all such ordinances and resolutions as the mayor or board may request"; "give advice and, upon request, prepare written opinions on all legal questions submitted to him by the board, the mayor, or any commissioner when such questions officially concern or relate to the city"; and represent the city in the courts and before administrative and legislative bodies. Sweetwater Mun. Code Ch. 5 (footnote omitted).

Chapter 2 of the Code concerns the City's personnel system. Sweetwater Mun. Code. § 4-201. It provides that one of the elected Commissioners must be designated the "Personnel commissioner," and that the city recorder must serve as the "Human resource officer" or delegate that function to an employee. *Id.* § 4-202. The Personnel Commissioner is "responsible for effective personnel administration." *Id.* § 4-204. The Human Resource Officer "administer[s] the personnel program." *Id.* Together, the Personnel Commissioner and the Human Resource Officer

---

[2] We have capitalized the titles of the City officials and entities whose actions form the basis of McGuire's claim. Where they appear in quoted material, however, we have preserved the original formatting and capitalization.

are charged with preparing proposed personnel rules governing "[d]isciplinary action, demotion, suspension and separation from the service of employees by resignation, layoff, separation, dismissal and for incapacity to perform required duties." *Id.* § 4-205(2), (2)(g). These rules are then to be submitted to the Board of Commissioners and Mayor for "adoption . . . by resolution." *Id.* § 4-205(1).

These provisions make clear that it is the Board of Commissioners and the Mayor who have final policymaking authority over terminations. The City Attorney has no such authority; he or she merely renders advice and opinions and offers proposed legislation for final approval or action by the Board of Commissioners and the Mayor. Sweetwater Mun. Code §§ 1-502, 1-503. Similarly, the Municipal Code delegates to the Personnel Commissioner and Human Resource Officer the authority to propose rules and regulations for the governing body to adopt, but it is the Board that retains the ultimate power to approve or reject these proposals. So, the policymaking authority of the Personnel Commissioner and Human Resource Officer—Moser and Morgan—is reviewable by the Board and therefore nonfinal. *Miller*, 408 F.3d at 814.

McGuire points to the City's Employee Handbook (adopted by the Board by resolution in 2006 and amended over the years, as evidence that the City has delegated its policymaking authority over personnel matters. The Handbook provides that it is to be "administered as part of the personnel authority of the Mayor and Board of Commissioners as provided in the City Charter as a delegation of personnel authority in conformity with the ordinance establishing a personnel system." Empl. Hbk. § 1D. The Handbook further explains that "[p]ursuant to the City Charter, the Mayor and Board of Commissioners has the authority to appoint, promote, demote, transfer, suspend and remove all officers and employees of the City. The Mayor and Board of Commissioners has, in limited fashion, delegated portions of that personnel authority as set out in

the Personnel Ordinance." Empl. Hbk. § 3I. Neither of these statements constitutes an explicit "delegation" of any specific authority, such as the authority to terminate employees. Instead, they simply provide that certain authority has been delegated "*as set out in*" the Personnel Ordinance, which, as discussed, grants the Personnel Commissioner and Human Resource Officer the discretion to "administer" the personnel program and propose rules and regulations for review of the Board. That is not the same as final, unreviewable decisionmaking or policymaking authority. *See Miller*, 408 F.3d at 814. Notably, the Handbook specifically affords Department Heads and Commissioners the independent authority to suspend employees for up to three days at a time (and those decisions are not grievable to the Board); it does not include such language with respect to firing employees. Empl. Hbk. § VIIIB, H, I.

Moser testified that "[f]or anyone to be terminated within the city, it must be brought before the city board and voted upon." Both Morgan and Wilson confirmed this. McGuire has offered no evidence to dispute these accounts of the practice of the City or local "custom." *Jett*, 491 U.S. at 737. In fact, she acknowledges that Morgan gave her the option of remaining employed until the next Board meeting, when the Commissioners would vote on whether to continue her employment.

The evidence in the record and the governing law, therefore, establish that the acts and decisions of Morgan, Moser, Wilson, and Cleveland with respect to their demand that McGuire resign or be terminated were not "final and unreviewable." *Miller*, 408 F.3d at 814 (quoting *Feliciano*, 988 F.2d at 655) (finding that shift commander who had "authority to make limited decisions concerning inmate medical care during her shift" was not a final policymaker where there was no evidence that her decisions were not subject to review). The City cannot be held liable for their involvement in McGuire's alleged constructive discharge. And McGuire made

clear at oral argument that she is not pursuing a theory of liability based on ratification by a final policymaker.

Our decision today does not insulate municipal governments from all liability. It does not mean, as McGuire contends, that a city like Sweetwater is only liable if an unconstitutional policy is presented to the Board and formally adopted. First, it is undisputed that McGuire knew she had the option of obtaining a final, unreviewable decision from the Board of Commissioners without sacrificing her health insurance or wages and chose not to do so. Second, it is well settled that a formal policy of constitutional violation is not required for municipal liability. Liability may arise through "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Jones,* 959 F.3d at 761 (quoting *Thomas*, 398 F.3d at 429 (6th Cir. 2005)). Indeed, the Supreme Court has repeatedly invoked this last category as a protective against "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 796 (1997) (quoting *Praprotnik*, 485 U.S. at 127).

McGuire also argues that the district court ignored a host of other retaliatory acts by Moser, Wilson, Morgan, and Cleveland, such as Morgan's direction to McGuire to "stop repeating her belief as to Wilson's conduct lest she be fired and sued" or the reading of the Cleveland Memo to McGuire by Morgan and Moser without giving her the opportunity to respond. But these individuals did not have final policymaking authority over a decision to terminate—only the Board did—and the City cannot be held liable for these actions.

Next, McGuire points to Morgan and Moser's "conditioning McGuire's continued health insurance on her submitting a resignation letter," but there is no evidence in the record to suggest

they did this. McGuire testified that Morgan offered to "keep [her] on until the end of the budget year and let the Main Street program elapse, just not renew the position." She did not claim that anyone told her if she accepted that option, her insurance would be revoked.

McGuire also contends that "Moser's and Morgan's order that [McGuire] immediately surrender her keys, computer, and phone" before she was formally disciplined was an adverse employment action separate from and independent of her termination. But this is a new claim raised for the first time on appeal. McGuire's Amended Complaint centered exclusively on her constructive discharge and Morgan's earlier comments to "back off" Wilson; she did not allege any order to surrender her equipment. Nor did McGuire mention it at her deposition when asked about what happened at the May 2 meeting and the next day, when she tendered her resignation. And McGuire did not invoke it as a separate basis for liability in her motion for summary judgment, her reply in support of that motion, or her opposition to the City's motion for summary judgment. She mentioned the incident only once below, in her response to the City's motion, where she characterized it as part of Morgan and Moser's "threat[s]" to fire her. We therefore decline to consider it as a separate basis for liability. *See*, *e.g.*, *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787–89 (6th Cir. 2005); *Priddy v. Edelman,* 883 F.2d 438, 446 (6th Cir. 1989) ("A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories . . . .").

Finally, McGuire claims that Morgan was the final policymaker as to the agenda policy, which she used "to dissuade and intimidate McGuire from speaking to the full board about Wilson's conflict." McGuire contends that Morgan "controlled" the Board's meeting agenda, that the meeting and workshop requirement were never formally adopted by the Board, and that

Morgan used the agenda policy selectively against McGuire to dissuade her from airing her view that Wilson had a conflict of interest, while permitting other citizens to speak freely at meetings.

The City Charter provides that the Mayor presides over meetings of the Board, and is to conduct them in accordance with "the most current edition of Robert's Rules of Order where not inconsistent with [the] charter." City Charter Art. V, § 3. Board meetings are to be open to the public, but the Charter does not afford citizens a specific right to speak. *Id.* at Art. V. The 2000 edition of Robert's Rules of Order—the version most current at the time of McGuire's allegations—explains that at public sessions of governing bodies, "non-members" "ordinarily have no right to participate." General Henry M. Robert, *Robert's Rules of Order* 93–94 (10th ed. 2000). The body "may invite non-members to express their views, but this is done under the control of the presiding officer subject to any relevant rules adopted by the body." *Id.* Because these procedural rules are incorporated by reference into the City Charter, they constitute the law of the City. They establish that it was the Mayor, or presiding officer in his stead, who had final policymaking authority over the agenda of Board meetings and a citizen's ability to speak at such a meeting.

Local custom—the actual practice of the City—supports this conclusion. Morgan testified that she prepared and implemented the agenda policy at the behest of the Board in 2011. According to her, "[t]he board told me exactly what they wanted the channel to be, and I typed it for them . . . I had no creative input in this." Moser similarly testified that the agenda policy "was formed by the . . . city board." Morgan explained that citizens are typically "not allowed to speak at the workshop without following the policy," but that "the mayor serves as chairman" of Board meetings, and under Robert's Rules of Order "can always open the floor if he chooses to." She further testified that "[i]f the chairman opens the floor to them, they can speak during the

meeting . . . . [But] unless there's a public hearing being opened, the public cannot make comments, even if there's an item for action, unless the chairman gives them permission to." McGuire has not offered any evidence to contradict local law and custom or Morgan's testimony. Accordingly, the City cannot be held liable for a claim that a constitutional violation resulted from alleged actions taken by an official without final policymaking authority in that area.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.