RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ASHLEY FRANKLIN,

　　　　　　　*Plaintiff-Appellant*,

*v.*

FRANKLIN COUNTY, KENTUCKY; RICK ROGERS; WES
CULBERTSON,

　　　　　　　*Defendants-Appellees*.

⎤
⎟
⎟
⎟
⎬　No. 23-6107
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:19-cv-00050—Gregory F. Van Tatenhove, District Judge.

Argued:  July 24, 2024

Decided and Filed:  August 15, 2024

Before:  GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky,
for Appellant.  Andrew T. Hagerman, STOLL KEENON OGDEN PLLC, Louisville, Kentucky,
for Appellees.  **ON BRIEF:**  Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY,
Prospect, Kentucky, for Appellant.  Andrew T. Hagerman, STOLL KEENON OGDEN PLLC,
Louisville, Kentucky, Paul C. Harnice, STOLL KEENON OGDEN PLLC, Frankfort, Kentucky,
Lilian M. Williams, STOLL KEENON OGDEN PLLC, Lexington, Kentucky, for Appellees.

───────────────

## OPINION

───────────────

　　RONALD LEE GILMAN, Circuit Judge.  In January 2019, Ashley Franklin was an
inmate at the Franklin County Regional Jail (the Jail).  When Franklin became ill on January 18

and needed to be transported to a hospital's emergency room, Jail Sergeant Brandon Price sexually assaulted her in the transportation van. Franklin brought this lawsuit against Price, Franklin County, and two other Jail employees, asserting constitutional claims under 42 U.S.C. § 1983 and several related claims under Kentucky state law.

The complaint alleged that both Price and his superior, Captain Wes Culbertson, were deliberately indifferent to a serious risk of harm to Franklin. It further asserted that Franklin County was liable for the assault on Franklin because of the County's alleged (1) practice of permitting lone male officers to transport female inmates to the hospital, (2) inaction with respect to preventing and detecting sexual assault based on previous misconduct at the Jail, and (3) inadequate training and supervision of its employees regarding the sexual abuse of inmates. Franklin also raised claims of negligence and gross negligence against Captain Culbertson and Jailer Rick Rogers.

Franklin moved for summary judgment against Price in the district court, and the defendants (except for Price) cross-moved for summary judgment against Franklin. The court granted Franklin's motion for summary judgment with respect to her Eighth Amendment claim against Price, but it otherwise denied her motion. It also granted in full the other defendants' motion for summary judgment. Franklin now appeals the grant of summary judgment in favor of the other defendants. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

On the evening of January 18, 2019, Franklin began feeling lightheaded and dizzy. She recognized that these symptoms stemmed from complications related to her high blood pressure. Franklin consequently asked the Jail staff to verify her condition.

Price measured Franklin's blood pressure and, thereafter, the Jail staff reported the measurement to a nurse. The nurse confirmed that Franklin's blood pressure was high, so Price

administered a medication that sought to reduce it. When the medication proved ineffective, Price transported her to a local hospital's emergency room.

Franklin claims that once she and Price arrived at the hospital, the two discussed her children and hope for parole in the near future. Price allegedly responded by informing Franklin that he knew someone on the parole board. He then insinuated that he could speak with this individual on Franklin's behalf if Franklin agreed to perform sexual favors for him. Franklin agreed and "took him up on that offer."

Franklin received medical treatment and was released from the hospital shortly after 1:00 a.m. on January 19, 2019. Price subsequently restrained Franklin in the back of the van in accordance with the Jail's policies. As Price was doing so, Captain Culbertson arrived in the hospital parking lot to check on Price to "make sure he didn't need anything before [Culbertson] went home." Franklin testified that Price appeared "nervous[]" and "shocked" when Culbertson arrived.

Price stepped out of the van and conversed with Culbertson for approximately 10 minutes about the weather and Franklin's health status. Culbertson remained in his car during the conversation and did not inspect the van or talk to Franklin. He later stated that he did not "notice anything out of the ordinary."

Franklin testified that once Price returned to the van, Price commented that he "almost got caught" by Culbertson. Price proceeded to pull into a parking lot near Big Eddy Road in Frankfort, Kentucky. He then climbed in the back of the van and exposed himself without fully removing his pants.

Franklin proceeded to perform a sexual act on Price while she was restrained. According to Franklin, Price demanded that she not tell anyone about what had happened and warned her that he would be fired if she did so.

When Franklin returned to her cell later that morning, she informed her cellmate about what had happened between her and Price. Franklin's cellmate reported the incident to the Jail's

staff the next day. The staff interviewed Franklin and Price about the incident, but they both initially denied that any sexual contact had occurred.

When the Jail's staff reviewed camera footage capturing Price's return from the hospital, however, another round of interviews was conducted. This time, Price and Franklin admitted that they had engaged in sexual contact. Rogers, the Jailer at the time, reported the incident to the Frankfort Police Department and requested that a detective take over the investigation.

Price's employment was later terminated. After being arrested, Price pleaded guilty to second-degree sexual abuse. He was subsequently sentenced to 12 months of imprisonment and to 24 months of probation.

Price's behavior was not the first time that members of the Jail's staff had engaged in sexually inappropriate behavior. Franklin directs us to three staff members who had previously engaged in inappropriate conduct: Timothy Harrod, Robert Kelty, and Kelly Rouse.

### 1. Timothy Harrod

In June 2017, Sergeant Timothy Harrod admitted to Culbertson that he had exchanged sexually charged notes with an inmate. The subsequent investigation revealed that Harrod had traded these notes during two terms of this inmate's incarceration. He also met with this inmate in a park after she was released from incarceration.

Harrod likewise supplied investigators with a note from this inmate that alluded to her alleged sexual relationship with another officer. The note stated: "Oh yeah[,] the camera in [protective custody] most def[initely] does not be working or I would [have] been in a lot of trouble while I was up there. And so would a fellow employee." This same inmate also alleged that another Jail officer "came back to [her] cell on numerous occasions, touching her breasts and below her waist," and that he "exposed himself to her on one of these contacts." During the investigation, another inmate alleged that an officer at the Jail "made a sexual advance towards [her] while she was incarcerated." No further details of this other incident are shown in the record.

The Jail ultimately terminated Harrod's employment, but it did not change any of its policies or training after these allegations were revealed.  Culbertson maintained that the Jail's "polic[ies] worked."

### 2. Robert Kelty

Sergeant Robert Kelty was also the source of sexually inappropriate behavior at the Jail in June 2017.  Kelty had exchanged sexually lewd pictures with his subordinate, Deputy Megan Webb, in violation of the Jail's policy.  They also engaged in a consensual intimate relationship.  Kelty was suspended for five days, demoted in rank, and relieved of supervisory responsibilities.

### 3. Kelly Rouse

Chief Deputy Kelly Rouse was similarly alleged to have engaged in inappropriate behavior with female staff at the Jail.  The Franklin County Attorney opened an investigation in response to allegations that Rouse had sexually harassed three female officers.  Franklin County hired a law firm based in Lexington, Kentucky to conduct an investigation, which was finalized in June 2018.

The report concluded that "Rouse has engaged in behavior of either an actual or implied sexual nature in the workplace such as to create a potential hostile work environment in violation of the [Jail's] sexual harassment policy." Noted by the report were examples of Rouse's inappropriate behavior, including "a practice of unwelcome touching involving female officers" and inappropriate comments made to female officers, such as a discussion about "placing a 'glory hole' in the wall adjoining his office to another in the [Jail] in which two female officers are stationed."  Jailer Rogers suspended Rouse when the investigation began.  Rouse retired before any further discipline could be handed down.

## B. Procedural history

Franklin filed a complaint in July 2019 against Franklin County, Culbertson, Price, and Rogers, asserting claims of deliberate indifference to a serious risk of harm, failure to train and supervise, battery, negligence, and gross negligence.  The defendants answered the complaint and the parties subsequently engaged in discovery.

In November 2022, Franklin moved for partial summary judgment against Price, raising claims based on the Eighth Amendment and state-law battery. The other defendants cross-moved for summary judgment the same day that Franklin filed her motion. Price did not file a motion for summary judgment. The district court granted Franklin's motion for summary judgment with respect to her Eighth Amendment claim against Price, but it declined to exercise supplemental jurisdiction over her state-law battery claim. Franklin later settled with Price, so he is not involved in this appeal.

The district court granted the other defendants' motion for summary judgment in its entirety. It first rejected Franklin's arguments that Culbertson was deliberately indifferent to a serious risk of harm. The court specifically determined that Culbertson did not act with deliberate indifference by allowing Price to transport Franklin alone, and that he could not be held liable for Franklin's sexual assault because he was not personally involved.

It next rejected Franklin's argument that Franklin County was liable for her sexual abuse. Franklin argued that the County maintained a policy of inaction by failing to prevent and respond to sexual misconduct. But the court concluded that Franklin failed to show a County policy or custom that caused her abuse. It elaborated by explaining that the three incidents cited by Franklin (concerning Harrod, Kelty, and Rouse) were insufficient to constitute "a clear and persistent pattern of unconstitutional conduct." The court also rejected Franklin's argument that the County should have implemented better transportation and training policies, concluding that nothing suggested that the policies or training were inadequate.

Finally, the district court addressed Franklin's arguments that Culbertson and Rogers were negligent for failing to (1) comply with the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301, and (2) enforce the Jail's rules. The court found both arguments unavailing. It rejected Franklin's PREA claim because it determined that Culbertson and Rogers were entitled to qualified immunity under Kentucky law. And the court found Franklin's negligence arguments unpersuasive because Franklin failed to establish the elements of negligence per se or negligence under Kentucky law. Franklin then filed a motion for reconsideration, which the district court denied in July 2023.

## II.  ANALYSIS

### A.    Standard of review

We review a grant of summary judgment de novo.  *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant."  *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).  A party opposing a properly supported summary-judgment motion, however, "may not rest upon mere allegation[s] or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### B.    Franklin County is not liable for Franklin's sexual assault

"A body politic is a 'person' within the meaning of § 1983."  *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (citation omitted).  But "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  This court has identified "at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  These avenues include: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  *Id.*

Franklin relies on the third and fourth avenues to support her argument that Franklin County is liable for her sexual assault.  Based on these two avenues of *Monell* liability, Franklin makes three arguments.  She contends that Franklin County is liable because of its (1) affirmative custom of permitting lone male officers to transport sick female inmates to the

hospital, which allegedly exposed vulnerable inmates to sexual abuse; (2) alleged inaction with respect to preventing and responding to sexual assault in light of previous incidents at the Jail; and (3) alleged failure to train, supervise, or discipline its employees regarding sexual abuse.

### 1. Franklin County's "affirmative" transportation custom does not render the county liable for Franklin's sexual assault

Franklin first argues that Franklin County is liable for her sexual assault because of its transportation practices. She specifically asserts that the Jail's practice of permitting a lone male officer to transport a female inmate to the hospital "[c]learly expose[s] sick, vulnerable female inmates to sexual abuse," in violation of the Eighth Amendment. Franklin thus pursues what this court has called an "affirmative" custom (or policy) claim against the Jail. *See North v. Cuyahoga County*, 754 F. App'x 380, 390–91 (6th Cir. 2018) (explaining that affirmative-custom-or-policy claims are based on an affirmative wrongdoing rather than a failure to act).

As an initial matter, the Jail's practice of permitting one male officer to transport a lone female inmate appears to be a custom rather than a policy. *See Ford*, 535 F.3d at 496 ("[Section] 1983's municipal-liability jurisprudence distinguishes between 'policy' and 'custom.'"). Nothing in the record suggests that the rules governing cross-gender transportation were "policies promulgated by the official vested with final policymaking authority for the municipality." *See Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005). The practices governing cross-gender transportation are therefore best characterized as a custom because they instead establish only "the knowledge of policymaking officials and their acquiescence in the established practice." *See Memphis Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). Neither party disputes that this custom exists. With this understanding in mind, we now turn to the relevant caselaw.

A "plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy [or custom], connect the policy [or custom] to the [County] itself[,] and show that the particular injury was incurred because of the execution of that policy [or custom]." *Graham ex rel. Est. of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (third alteration in original) (quoting *Garner v. Memphis Police Dep't*, 8. F.3d 358, 364 (6th Cir. 1993)). "There must be 'a direct causal link' between the policy and the alleged constitutional

violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Id.* (citation omitted). "This type of municipal liability is sometimes referred to as an affirmative policy or custom theory." *North*, 754 F. App'x at 386.

When a plaintiff demonstrates that an individual municipal employee violated her constitutional rights, "[t]his [affirmative-policy-or-custom theory] does not require a showing that the municipality acted with deliberate indifference to the risk of constitutional violations." *Id.* at 391; *see also Garner*, 8 F.3d at 365–66 (rejecting the applicability of a deliberate-indifference showing because the plaintiff raised an affirmative custom-or-policy claim rather than a failure-to-train claim).

The County does not contest that the Jail practiced the transportation custom identified by Franklin. And because the parties concede that Price violated Franklin's Eighth Amendment rights, the final showing that Franklin must make is "that [her] injury was caused by the execution of that [custom]." *See North*, 754 F. App'x at 390–91.

In the present case, Franklin argues that the Jail "had a practice that clearly exposed sick, vulnerable female inmates to sexual abuse." But this argument shows only that the Jail's transportation custom provided the opportunity for Price's unlawful behavior. Opportunity alone, however, fails to show that the Jail's custom "direct[ly]" caused Franklin's assault. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004). Indeed, Franklin must "show that the particular injury was incurred *because* of the execution of that policy [or custom]." *See Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996) (emphasis in original) (quoting *Garner*, 8 F.3d at 364).

Franklin fails to explain how her assault was "a direct result of [the Jail's] . . . custom," as opposed to Price's unilateral, unlawful actions. *See Blackmore*, 390 F.3d at 900. Price's unlawful actions, after all, were not "pursuant to" the Jail's policy. *See Garner*, 8 F.3d at 365. Franklin thus seeks to hold the Jail liable "for an injury inflicted solely by" Price. *See Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). This theory of liability is based on "*de facto respondeat superior* liability[, which is] explicitly prohibited by *Monell*." *See Doe*, 103 F.3d at 508 (emphasis in original). We therefore reject Franklin's first theory of *Monell* liability.

## 2. *Franklin County is not liable under a theory of "inaction"*

Franklin next argues that the County is liable for Price's actions due to the Jail's alleged policy of "inaction." She specifically maintains that "Franklin County knew that female inmates were particularly vulnerable to sexual assault, that they would be subjected to cross-gender supervision and transport, and that these circumstances carried an obvious risk of sexual misconduct." Relying heavily on her claims that the Jail was "aware that multiple instances of sexual misconduct had occurred within the facility" and that "cross-gender supervision required a greater level of care," Franklin asserts that the Jail, "through its inaction, inculcated a 'culture of indifference' toward the sexual abuse and assault of female inmates and staff in the Jail." She thus argues that Franklin County had a policy or custom of inaction toward the sexual abuse of inmates.

To succeed on a municipal-liability claim under an "inaction" theory, a plaintiff must show "(1) the existence of a clear and persistent pattern of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe*, 103 F.3d at 508).

Franklin must first show a clear and persistent pattern of unconstitutional conduct. *See id.* With respect to how many instances are required to constitute a "clear and persistent pattern," this court has observed that a plaintiff "'cannot rely solely on a single instance' to prove the existence of an unconstitutional custom." *Winkler v. Madison County*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *Thomas*, 398 F.3d at 433); *see also Stewart v. City of Memphis*, 788 F. App'x 341, 347 (6th Cir. 2019) (explaining that "one instance of potential misconduct" under an inaction theory is a path to municipal liability that "has been forbidden by the Supreme Court" (quoting *Thomas*, 398 F.3d at 432–33)).

This court, however, has concluded that five similar incidents over the course of three years were sufficient to constitute a pattern. *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477,

2022 WL 17748619, at *13 (6th Cir. Sept. 2, 2022). But it has also concluded that three instances of similar misconduct revealed in one police investigation did not establish a clear and persistent pattern. *Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007).

Another ambiguity in this area is that "our circuit does not appear to have explained how 'similar' past incidents must be to constitute a 'pattern of similar constitutional violations.'" *Simpkins*, 2022 WL 17748619, at *13 (citation omitted). But this court's unpublished opinion in *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019), provides persuasive guidance in addressing "similarity." The *Berry* court held that the similarity between a plaintiff's claim and an alleged pattern of constitutional violations "must be particularized." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). What that means in practical terms is that "the prior examples of wrongdoing must violate the same constitutional rights [as the plaintiff's] and violate them in the same way." *Id.* at 863. The alleged pattern of similar unconstitutional conduct, however, need not be identical, or even "almost identical" to that which a plaintiff alleges occurred in her case. *Simpkins*, 2022 WL 17748619, at *13 ("No caselaw within our circuit requires the production of evidence of almost identical conduct.").

Using this framework, Franklin would need to show that there was a pattern of Eighth Amendment violations at the Jail (i.e., the same constitutional right that Price violated), that involved some sort of sexual assault on inmates (i.e., the right was violated in the same way as Franklin's was). *See Berry*, 796 F. App'x at 862. But she would not need to demonstrate that the assault specifically occurred on a transportation vehicle. *See id.* Given the fact-specific nature of allegations concerning patterns of similar constitutional violations, this inquiry is necessarily context-dependent.

In the present case, the three incidents of misconduct highlighted by Franklin are insufficiently similar to Price's conduct. Kelty, for example, allegedly sent a lewd picture and had sexual relations with one of his subordinate officers. An officer's inappropriate relationship with a subordinate officer is a factual circumstance that is materially dissimilar to an officer sexually assaulting an inmate. *See Connick*, 563 U.S. at 62–63 (observing that four prior *Brady* violations were not deemed similar enough to an unrelated *Brady* violation because "[n]one of th[e] [earlier *Brady* violations] involved failure to disclose blood evidence, a crime lab report, or

physical or scientific evidence of any kind"). Kelty's wrongdoing thus did not violate his subordinate officer's rights in the same way that Price's behavior violated Franklin's. *See Berry*, 796 F. App'x at 862.

This same logic precludes a finding that Rouse engaged in conduct similar to Price. Although Rouse made inappropriate comments and fostered a "potential[ly] hostile work environment," he was never accused of sexual assault.

Harrod's case and the ensuing investigation is a closer call. He is alleged to have exchanged sexually charged notes with an inmate. Although this behavior is closer to what Price did given that these acts involved an inmate, Harrod's note passing did not involve any sexual contact. Harrod's wrongdoing therefore did not violate that inmate's rights in the same way that Price's misconduct violated Franklin's rights. *See id.* Even though past relevant behavior need not be "almost identical," *see Simpkins*, 2022 WL 17748619, at *13, the passing of sexually charged notes is of a materially different character than sexually assaulting an inmate. *See Connick*, 563 U.S. at 62–63.

Nor do the revelations flowing from Harrod's investigation persuade us that the County is liable. Harrod's investigation reported that an inmate had alleged that an officer came to her cell "numerous" times and "touch[ed] her breasts and below her waist," and that he "exposed himself to her on one of these contacts." And the investigation also noted that another inmate claimed that an officer "made a sexual advance towards [her] while she was incarcerated." Even assuming that these allegations satisfy the first three inaction prongs, there is no evidence in the record that Franklin County's alleged "policy of inaction was the 'moving force' of the constitutional deprivation." *See Winkler v. Madison County*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014)).

The record instead demonstrates that Price's actions were "rogue." Price himself admitted that he knew that he was violating the Jail's policy by sexually assaulting Franklin. Franklin's constitutional violation thus "resulted from factors other than a faulty [County policy]." *Graham ex rel. Est. of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)).

For similar reasons, Franklin's argument that the County is responsible for her assault because it failed to "implement[] all of PREA's requirements, especially those geared toward prevention," is unavailing. Even if we accepted Franklin's argument that the Jail's policies concerning PREA were somehow suboptimal, "the fact that alternative procedures might have better addressed a prisoner's particular needs does not show that the County was deliberately indifferent." *See id.* (cleaned up). Indeed, this is not a case in which there is a "total lack of any County policies" governing the prevention of sexual assault. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004). The Jail's policies explicitly prohibit sexual contact between inmates and staff, require information to be given to each inmate about preventing and reporting such incidents, subject all employees who fail to comply with the Jail's PREA policy to disciplinary action or termination, and require all employees who witness or have knowledge of any sexual activity to report it. We therefore conclude that the County is not liable on a municipal-liability theory of inaction.

### 3. *Franklin County is not liable under a failure-to-train theory*

The final theory of *Monell* liability asserted by Franklin is based on Franklin County's alleged failure to train, supervise, or discipline its employees with regard to the sexual abuse of inmates. "To succeed on a claim based on inadequate training, [a plaintiff] 'must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex. rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

"This court has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise." *Ellis*, 455 F.3d at 700. The first "is [a] failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Id.* at 700–01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). "A second type of . . . deliberate indifference is where the [municipality] fails to act in response to repeated complaints of constitutional violations by its officers." *Brown*, 172 F.3d at 931. Franklin appears to rely on the first situation, arguing that an absence of written policies and adequate training "carried an obvious risk of sexual misconduct." "The [first] mode of proof is

available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Winkler*, 893 F.3d at 903 (alterations in original) (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015)).

In the present case, Franklin contends that the training that the Jail staff received was constitutionally inadequate because the County made "deliberate choices not to . . . have written policies on preventing sexual misconduct" or to "train officers on PREA's requirements regarding prevention [of sexual abuse]." But her contention that the Jail did not have written policies on preventing sexual abuse is belied by the record. The Jail's written policy about sexual misconduct expressly acknowledges that the "[PREA] establishes a zero tolerance standard for incidence of inmate sexual assault and rape; [and] makes prevention of inmate sexual assault and rape a top priority in [the] facility." Moreover, the written policy forbids "sexual activity between staff and inmates, volunteers, contract personnel, or work site supervisors and inmates regardless of consensual states [*sic*]," and it subjects offenders to "administrative and criminal disciplinary sanctions."

Information is also "provided to . . . inmates about sexual abuse/assault[,] including prevention/intervention [and] reporting sexual abuse/assault. . . . [This] [i]nformation [is] communicated orally and in writing at the time of booking[,and] [t]he inmate will sign [a document] acknowledging receipt of this information." Further undermining Franklin's position is that all Jail officers must undergo a PREA training course before ever interacting with inmates, where the officers learn how to prevent sexual abuse.

These facts demonstrate that, contrary to Franklin's contention, the Jail did have written policies concerning the prevention of sexual misconduct. The policies provide that the prevention of sexual assault is a top priority of the Jail, and they require that inmates be provided information about preventing such conduct. This is not a case where there is a "total lack of any County policies" governing the prevention of sexual assault. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004). Franklin's failure-to-train argument on this point is accordingly unpersuasive because there are in fact written policies (and trainings) governing the prevention of sexual assault in the Jail.

Franklin relatedly asserts that the Jail failed to "train officers on PREA's requirements regarding prevention." She notes, for example, that Captain Culbertson and Jailer Rogers stated that they could not specifically recall ways in which they were trained to prevent and detect sexual assault. According to Franklin, this inadequate training amounted to deliberate indifference in preventing the sexual abuse of inmates.

But Franklin's argument fails because the record contradicts its premise. The Jail's PREA Coordinator, Jeff Waldridge, testified that every new employee must be trained to comply with the PREA, including on how to prevent sexual abuse from occurring. Employees must also complete annual training on how to comply with the PREA, including on how to prevent sexual abuse. And as previously noted, each officer must complete PREA training before they ever supervise inmates.

Waldridge also discussed the sexual-abuse prevention techniques that officers learn in training. He testified, for example, that officers are trained to separate vulnerable inmates, like youth and transgender offenders, from "serious felons" when considering where to house inmates. Waldridge further testified that officers are trained on how to recognize issues among inmates when they conduct rounds. These examples—considered with (1) the Jail's strict zero-tolerance policy of sexual abuse, (2) annual PREA training, and (3) maintenance of a PREA coordinator—reflect constitutionally adequate training. *See Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.").

Franklin nevertheless argues to the contrary by relying on the Seventh Circuit's decision in *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020) (en banc). She contends, based on that case, that Franklin County had adequate notice that an absence of "written policies, practices, and training to adequately address the risk" of sexual abuse carried an obvious risk of sexual assault.

In *J.K.J.*, the en banc Seventh Circuit held that a county was liable for the repeated sexual assaults on two inmates. The court concluded that "[t]he jury had ample evidence to find that [the county's] failures—both the prevention and detection gaps in its written policies and the

absence of training—occurred in the face of an obvious *and* known risk that its male guards would sexually assault female inmates." *Id.* at 381 (emphasis in original).

Examples of these failures in *J.K.J.* included that (1) the county "was aware of sexual misconduct," including one officer who groped and made sexually inappropriate comments toward an inmate and another officer who sexually assaulted two inmates for three years; (2) jail staff "received no training (in any sense of the word) focused on the sexual harassment or assault of female inmates"; (3) the jail did not have a PREA coordinator; (4) the county continued to employ staff who sexually abused inmates; and (5) the county lacked a zero-tolerance policy on sexual abuse and harassment. *Id.* at 372–75, 382–84. These factors, coupled with the power that male officers had over female inmates, led the court to conclude that the county was liable for the sexual abuse of the plaintiffs.

But that case is distinguishable from the one before us for several reasons. Unlike the jail in *J.K.J.*, the Jail here maintains a strict zero-tolerance policy against sexual abuse. The jail in *J.K.J.* likewise lacked any training concerning the sexual assault of inmates, whereas the Jail requires annual training about the PREA and mandates that all new officers undergo a pre-employment PREA training session. Another distinction is that the Jail maintains a PREA coordinator who investigates allegations of sexual misconduct. Nor does the record show that the Jail was aware of any comparable level of sexual abuse in the way that the jail in *J.K.J.* was. These factual differences render *J.K.J.* inapposite. We therefore find Franklin's failure-to-train argument unpersuasive.

**C.    Franklin's claims against the individual defendants**

### 1.    *Franklin's deliberate indifference claim against Captain Culbertson*

Franklin also raises claims against the individual defendants. She argues that Culbertson was deliberately indifferent to her safety because he (1) permitted an "unsupervised male guard" to transport "a sick, incarcerated woman" and (2) did not assign the onsite female guard or require another guard to accompany Price. Franklin also points to Culbertson's decision to check on Price at the hospital, "under [which] circumstances . . . a reasonable jury could infer

that he was having second thoughts about his decision and was concerned about a risk of sexual assault."

Culbertson raises the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up). Because Franklin does not adequately allege a constitutional violation by Culbertson, and because addressing her claim is more straightforward on that basis, we need not reach the "clearly established" prong of the qualified-immunity analysis. *See id.* at 236–37 (holding that courts may use their discretion in deciding which qualified-immunity prong to address first).

"To raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two-part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This test thus has both an objective and a subjective component. *See id.*

To satisfy the objective component, "a prison inmate first must show that the failure to protect from [the] risk of harm is objectively 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 833). The subjective component requires that "a plaintiff also must show that prison officials acted with 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 834). "An official is deliberately indifferent if he or she 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Id.* at 766–67 (quoting *Farmer*, 511 U.S. at 837). Proof of subjective knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

The parties here do not dispute that Franklin's sexual assault was sufficiently serious under the objective component of her Eighth Amendment deliberate-indifference claim. So Franklin is left to satisfy only the subjective component.

In the present case, Franklin contends that Culbertson acted with deliberate indifference because he did not require an additional officer to accompany Price (or have a female officer transport her instead) on the night that Price assaulted Franklin. But nothing in Price's background or history would have put Culbertson on notice that Price posed a threat to female inmates. And Franklin fails to cite any authority forbidding a lone male officer from transporting a female inmate. She also cites no authority for her bare assertion that Culbertson (who is also a male officer), rather than Price, should have transported her to the hospital.

Franklin likewise presents no evidence that Culbertson is liable under a theory of supervisory liability. "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A supervisor must instead "actively engage[] in unconstitutional behavior" by "somehow encourag[ing] or condon[ing] the actions of [his] inferiors." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

Franklin has not established any such participation by Culbertson. Culbertson testified that nothing seemed out of the ordinary when he checked on Price, certainly nothing that would put him on notice that Franklin's safety was at risk. Franklin has pointed to no evidence in the record contradicting this statement or otherwise suggesting that it is factually inaccurate. Thus, Franklin has failed to show that Culbertson "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of" Price. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

Franklin nevertheless maintains that Culbertson "was having second thoughts about his decision and was concerned about a risk of sexual assault" by checking on Price the night of the assault. To the contrary, Culbertson explained that whenever he had a subordinate officer transport an inmate to the hospital, he would "always ma[ke] it a goal to go check on that deputy, to make sure they didn't need to go out and smoke, make sure they didn't need to use the restroom. . . . [He] did that with everybody that went to the hospital. [Culbertson had] driven through snow storms to go to Lexington and check on deputies before." He further confirmed that "[t]hat was [his] sole purpose for going up there, was to check and make sure [Price] didn't need anything before [Culbertson] went home." Franklin has not proffered any evidence to the

contrary. We therefore find Franklin's deliberate-indifference claim against Culbertson unavailing.

### 2. *Franklin's negligence claims against Culbertson and Rogers*

Franklin next argues that Culbertson and Rogers were negligent. She asserts that Culbertson was negligent for failing to insist that Price "strictly observe the [transportation] rules and report to the shift supervisor back at the Jail that [Franklin] had been released from the hospital and his mileage." Franklin also argues that Culbertson negligently failed to protect her. As for Rogers, Franklin contends that he negligently failed to train his staff and enforce transportation policies that would have prevented Franklin's sexual assault.

As an initial matter, Franklin's argument that Culbertson negligently failed to protect her is forfeited because she dedicates only one sentence of her appellate brief to that argument. *Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012, 1027 (6th Cir. 2019) ("[I]t is a settled appellate rule that a party forfeits issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (citation omitted)).

In any event, Culbertson and Rogers reassert the defense of qualified immunity, raising the defense under Kentucky law. Under Kentucky law, qualified immunity protects public officers and employees sued in their individual capacities from "damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies to officers who perform "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (internal citations omitted). But qualified immunity does not protect employees "for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.*

Culbertson and Rogers argue that the Jail's transportation policies and enforcement of the PREA are discretionary duties that entitle them to qualified immunity under Kentucky law. Franklin disagrees. She maintains that enforcement of the Jail's transportation policies and

PREA rules are ministerial duties that Culbertson and Rogers failed to enforce.  According to Franklin, the breach of these ministerial duties defeats a claim to qualified immunity under Kentucky law.  Her negligence claim thus turns on whether enforcement of the Jail's transportation policies and PREA rules was a discretionary or instead a ministerial duty.

Franklin first contends that the Jail had a nondiscretionary transportation policy forbidding lone male officers from transporting female inmates.  She thus asserts that, by permitting Price to transport Franklin alone, Culbertson and Rogers negligently breached the Jail's transportation policy prohibiting cross-gender transportation.

But the Jail simply has no policy prohibiting a lone male officer from transporting a female inmate.  It likewise has no policy requiring female officers to transport female inmates.  Rogers's uncontradicted testimony establishes that there was no such requirement or expectation with respect to the gender of an officer who transports a female inmate.  Because enforcement of this nonexistent gender practice concerning the transportation of inmates is necessarily not "absolute, certain, and imperative," *see id.*, it is not ministerial.  Culbertson and Rogers are thus entitled to qualified immunity with regard to this argument.

The second allegedly ministerial duty that Rogers breached is his noncompliance with the PREA.  Franklin argues that Rogers breached a ministerial duty by failing to implement mandatory PREA training and policies designed to prevent sexual abuse.  To the contrary, the "PREA does not provide a specific, mandatory course of action for how agencies supervise . . . their employees.  The PREA regulations concerning employee discipline provide agencies with discretion." *Peralta v. United States*, No. 19-cv-08912, 2020 WL 13210654, at *3 (C.D. Cal. Oct. 23, 2020) (quoting 28 C.F.R. § 115.76)).  They likewise do not provide specific mandatory courses of action on how to protect inmates.  *See* 28 C.F.R. § 115.13(a).  In the absence of any such mandatory requirements, Rogers's strategies, training, and compliance with the PREA's goals are discretionary duties, "involving the exercise of discretion and judgment," which entitles him to qualified immunity.  *See Yanero*, 65 S.W.3d at 522.

Franklin next argues that Culbertson negligently breached his ministerial duties when he failed to insist that Price follow the Jail's mileage-reporting rule during Franklin's cross-gender

transportation.  But Franklin failed to make this argument in the district court, so the argument is forfeited, and we decline to consider it.  *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("It is well-settled that this court will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice." (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997))).  We see no "plain miscarriage of justice" under the present circumstances.

In sum, Culbertson and Rogers are entitled to qualified immunity under state law because they performed discretionary functions in good faith that were within the scope of their employment.  *See Yanero*, 65 S.W.3d at 522.  They are therefore entitled to summary judgment on Franklin's negligence claims.

### 3.  *Franklin's gross negligence claim is forfeited*

Franklin further contends that Culbertson and Rogers were grossly negligent. But after stating in one sentence what gross negligence requires under Kentucky law, Franklin argues only that "[w]hen confronted with evidence that Rogers and Culbertson took no action, a jury could reasonably conclude that conduct exhibited a reckless disregard for the safety of people like Plaintiff." **[*Id.*]** Franklin does not specify which nonaction or conduct she is referring to.  Her one bare assertion lacks any elaboration or development.  Absent such development, Franklin has forfeited this argument.  *See Lou's Transp., Inc.*, 945 F.3d at 1027.

## D.      Franklin abandoned her challenge to the district court's denial of her motion for reconsideration

Franklin's final challenge is to the district court's denial of her motion for reconsideration. But because she failed to raise this issue in her opening brief, she has abandoned any appeal of the court's decision on this issue.  *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) ("[A]n 'appellant abandons all issues not raised and argued in its initial brief on appeal.'" (quoting *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014))).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.