NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0444n.06

No. 24-5002

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 06, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| R.L., on behalf of R.S., a minor, | ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) ) | |
| KNOX COUNTY, TENNESSEE, dba Knox County Board of Education, | ) ) | OPINION |
| Defendant-Appellee. | ) ) ) | |

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant R.L., proceeding on behalf of her minor daughter R.S., appeals the grant of summary judgment to Defendant-Appellee Knox County Board of Education (KCBE).[1] She alleges that KCBE was deliberately indifferent to R.L.'s report of sexual misconduct by another student against R.S., in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681–88, and the Fourteenth Amendment.[2] We AFFIRM.

---

[1] The complaint claims to sue "Knox County d/b/a Knox County Board of Education" as if they are the same entity. (R.1., PID 1) But Knox County and KCBE are distinct, each with non-coextensive jurisdictions. Tenn. Code Ann. § 49-2-201 *et seq.* (2024) (code provisions establishing county boards of education); *Duncan v. Coffee Cnty.*, 69 F.3d 88, 96 (6th Cir. 1995) ("Although Tullahoma residents live in a political entity called Coffee County, they do not in this case live in the political entity that we call the Rural Coffee County School District."). However, KCBE conceded below that R.L. intended to sue KCBE, and that it received adequate notice.

[2] R.L. has abandoned her claim under the Tennessee Government Tort Liability Act, Tenn. Code Ann. § 29-20-201 *et seq.* (2024), on appeal.

## I. Background

## A. Factual Background

Defendant KCBE operates the public schools in Knox County, Tennessee. During the period at issue, KCBE had a Title IX Coordinator on staff and had established policies and procedures addressing Title IX compliance.[3] It also provided annual training to staff on working with students with disabilities, Title IX compliance, sexual harassment, sexual discrimination, child abuse, and other KCBE policies.

R.S. is on the autism spectrum and has complex intellectual disabilities, including significant communication and cognitive deficits. One way these disabilities manifest is that she "does not have a normal sense of time passing." (Appellant's Br. at 11; R. 51-2, PID 1414 ("Time is infinity to her.")).

The events giving rise to this case took place while R.S. attended Powell Middle School (PMS) and Powell High School (PHS), both run by KCBE. R.S. had an Individual Education Program (IEP) that was developed and periodically modified by an IEP team consisting of her mother and staff members. Pursuant to her IEP, R.S. attended special-education classes in the Comprehensive Development Classroom (CDC). Kristin Farley, R.S.'s eighth-grade special-education teacher, trained peer tutors (students from the general student body who assisted in the CDC) and adult helpers to provide support for the CDC, like escorting CDC students to their

---

[3] Appellant attempts to make this a disputed factual issue by citing testimony from staff who, for example, could not name the Title IX coordinator. But such discrepancies do not, alone, create a factual dispute, especially when Appellant does not contest that the Title IX Coordinator's contact information was listed in KCBE's Discipline Procedures Manual and on its website. (R. 51-7, PID 1578 ("It's … posted in the manual[.] … It's also posted on the website.")). Testimony that certain staff members did not receive Title IX-specific training from KCBE, (*see, e.g.*, R. 58-4, PID 3017 ("[D]ifferent jobs have different trainings; right? And so I have not been trained in Title IX.")), likewise does not create a dispute over whether KCBE gave other staff Title IX training. And Appellant discusses KCBE's policies regarding equal opportunity and harassment in her own opening brief. Whether the policies, procedures, and training were adequate is a separate question, not at issue in this case.

general classes and to the bathroom. In addition to attending class in the CDC, R.S. attended chorus, to which she was escorted by a peer tutor.[4]

On September 27, 2019, R.L. texted Farley that R.S. had told R.L. that a boy "bothered" R.S. in the hallway outside the chorus classroom, but that R.L. did not want "to accuse someone in error due to [R.S.'s] perception." (Doc. 56-9, PID 2469–72). More specifically, R.S. told R.L.: "my daddy be big mad"; "[s]top, I no like it"; and "1, 2, 3 let go" (a phrase commonly used to teach special-education students the socially appropriate amount of time for actions like hugs). (*Id.* at PID 2471). R.S. then brought her yearbook to school and used it to show Farley the boy who allegedly bothered her—Student A.[5]

The PMS staff investigated the matter. First, Principal Beth Ingraham[6] reviewed Student A's records. He had three disciplinary incidents, but none of those incidents involved sexual harassment and he was not scheduled to attend any classes with R.S. Farley then spoke with R.S's chorus teacher, the CDC peer tutors, and Assistant Principal Virginia Powers, none of whom had

---

[4] R.L. claims that "Dr. Ingraham confirmed that this was the practice, but it was possible R.S. could have walked from her classroom to the chorus room alone." (Appellant's Br. at 16–17). But the record does not support that claim. The relevant portion of the deposition reads:

> Q: Was she always accompanied to chorus with a peer tutor?
>
> A: To my knowledge. I certainly would not be able to go back and say that with certainty. But that is our practice.
>
> Q: So it's possible that she went to chorus on her own?
>
> A: Very doubtful. It's possible that she would have eaten Pop Tarts the day before. There is no way for me to know that specifically. You understand what I'm saying? So no, she should not have attended chorus on her own and she did have a peer tutor assigned to her and I physically saw it.

(R. 56-4, PID 2292).

[5] R.L. also claims that "Farley knew the identity of Student A even before the September[] 2019 assault occurred." (Appellant's Br. at 18). But Farley testified the opposite. And after R.L. reported the September 2019 incident, Farley responded to the complaint via text on the very same day: "The admin watched the cameras for both before and after chorus for all week … . The student is not in chorus with her. He is in [the] classroom next door." (R. 51-10, PID 1710).

[6] Although the parties refer to Beth Ingraham as both "Dr. Ingram" and "Dr. Ingraham," her deposition lists her name as "Beth Ingraham." (R. 56-4, PID 2280).

ever seen R.S. and Student A interact inappropriately. Next, Powers reviewed several days of security footage from the hallway outside the chorus classroom, which also showed no interactions between R.S. and Student A. After Farley shared the results of her investigation with R.L., the two decided to "wait and see" if anything else happened because "it was not uncommon for [R.S.] to say people were bothering her in the hallway." (R. 51-4, PID 1497). Farley also instructed the CDC peer tutors to report any future interactions between R.S. and Student A, as well as any other incidents in the hall outside the chorus classroom.

R.S. began therapy with Rachel Ross in November 2019. R.S.'s IEP team also met on three occasions shortly after the September 2019 incident: October 14, 2019, January 17, 2020, and February 4, 2020. R.L. testified in her deposition that she raised concerns about Student A at each of those meetings but did not testify to the details of the concerns she raised.[7]

The next developments occurred in Spring 2020. First, KCBE closed public schools in Knox County on March 16, 2020, due to the COVID-19 pandemic. Then, around May 25, 2020, R.S. told R.L. details that led R.L. to believe that Student A raped R.S. in the eighth-grade bathroom at PMS in March 2020. R.S. conveyed to her mother that she had been sexually assaulted by saying a boy had hurt her, removing her clothes, pointing to her vagina, bending her hand back, pulling her hair, getting on her hands and knees, and laying on the carpet with her legs spread. R.S. then pointed to Student A's picture in the eighth-grade yearbook. R.L. promptly contacted Ross and scheduled a therapy appointment for later that week. Ross then contacted the Department of Child Services (DCS).

---

[7] The parties dispute what they discussed during those IEP team meetings. Farley, who also participated, testified that she does not recall R.L. raising concerns about Student A. And, although the meeting notes that R.L. signed memorialize other concerns she raised, they do not show any discussion of Student A. However, we view the evidence in the light most favorable to the non-movant—here, R.L.

On May 28 and 29, 2020, R.L. spoke with Ingraham about what R.S. had told her. Ingraham remembers R.L. telling her that R.S. reported Student A had "peed in her" in the eighth-grade bathroom. (R. 56-4, PID 2292–93). After Ingraham reported the allegations to DCS, she spoke with law enforcement on at least three occasions.

Law enforcement investigated the matter. As part of that investigation, they reviewed the school security-camera footage. When a detective met with R.S. in July 2020 to discuss the incident, R.S. led him to a different bathroom than the one where she previously said the assault happened. Detectives also interviewed Student A prior to his return to PHS and declined to bring charges relating to the incident. The investigation concluded with no disciplinary actions or criminal prosecutions taken against Student A.

R.L. took R.S. for a gynecological exam at East Tennessee Children's Hospital in Summer 2020. The results of that examination were "consistent with [sexual assault] but [showed] no evidence of any permanent injuries." (R. 56-12, PID 2560). The treating physician specifically noted that there was "a cleft of the hymen at 5 o'clock consistent with a history of hymenal trauma" and "a small tag hanging from the hymen." (*Id.* at PID 2559).

R.S. began attending Powell High School (PHS) when KCBE schools reopened in Fall 2020. In preparation for the 2020–21 school year, R.S.'s IEP team met on August 5, 2020, to develop a safety plan for R.S. during her time at PHS. Among other steps, PHS assigned a teaching assistant to escort R.S. through the building, required staff to signal each other when handing off supervision duties, and placed a "flag" in the school scheduling system to prevent R.S. and Student A from being assigned to the same classes.

Student A also attended PHS for the 2020–21 school year but attended virtually for the first semester. When R.L. learned that Student A was returning to in-person classes in Spring 2021, she obtained an agreed restraining order against him.[8]

Early in January 2021, the teaching assistant who escorted R.S. between classes began taking R.S. on a different route from the CDC to Phys. Ed. to avoid running into Student A while he was going to lunch in the same area. PHS Principal Chad Smith also showed a photo of Student A to R.S.'s hallway escort and told her to alert Smith if she encountered Student A while escorting R.S. to Phys. Ed.

R.S. saw or may have seen Student A in the hallway, in the cafeteria, or when she attended a school football game at which Student A was playing on the football team.[9] R.L.'s notes in her planner state that R.S. saw Student A in her Phys. Ed. class on January 6, 2021, and in the hallways on January 7, 14, 15, 20, 21, and 27. Those same notes also state that Student A "said [the] 'f' word to [R.S.]" on February 10, 2021. (R. 51-14, PID 1945). Additionally, R.L. contends that R.S. told her therapist that Student A kissed her during Phys. Ed. class in January 2021—an incident R.L. says she discussed with R.S.'s teacher Tami Smith by phone.

---

[8] The parties dispute whether PHS received a copy of the restraining order. There is no evidence in the record that Student A provided PHS with a copy of the restraining order. R.L says she gave a copy of the restraining order to an unnamed PHS staff member on January 5, 2021. She also says Tami Smith, R.S.'s teacher at PHS, knew about the restraining order because R.S. missed school for a court hearing. And R.L. emailed administrators on January 11, 2021, saying she had dropped off a copy of the restraining order. R.L. also says she emailed a copy of the restraining order to Knox County Schools Supervisor of Secondary Education Sally Reynolds and KCBE's attorney on January 27, 2021. But, although several PHS staff members testified that they were generally aware of the restraining order, they said they never saw a copy of it. Viewing the evidence in the light most favorable to R.L., we assume PHS had knowledge of the restraining order.

[9] R.L. claims that R.S. and Student A were assigned to the same Phys. Ed. class. But no evidence other than R.L.'s testimony supports that claim. And Student A's official class schedule shows that he did not take Phys. Ed. until the following school year. Because that official document, along with the remainder of the record, "blatantly contradict[s]" R.L.'s claim, we do "not adopt [R.L.'s] version of the facts" about R.S.'s and Student A's Phys. Ed. schedules. *Scott v. Harris*, 550 U.S. 372, 380 (2007). We do, however, credit her allegations about interactions between R.S. and Student A.

R.S.'s IEP team met again on February 12, 2021. The notes from that meeting state, in relevant part: "Due to an alleged trauma with a peer, the outside therapist and mom asked that all staff that will be walking with [R.S.] know what the student looks like (in order to provide support to [R.S.]). … [R.S.] will be able to access security by typing 911 in her communication device." (R. 56-14, PID 2776).

In April 2021, R.L. informed PHS that she was considering withdrawing R.S. from PHS and switching her to homebound services. The IEP team met three times—once in April 2021, once in May 2021, and once in June 2021—to discuss R.S.'s withdrawal. After the June 2021 IEP team meeting, KCBE offered virtual homebound services to R.S. so that she could complete the 2020–21 school year. R.L. has homeschooled R.S. since that time.

### B. Procedural History

On March 1, 2021, R.L. sued "Knox County, Tennessee, d/b/a Knox County Board of Education" on behalf of R.S. (R. 1, PID 1). She brought three claims: one for Title IX violations (Count 1); a 42 U.S.C. § 1983 claim alleging violations of the Fourteenth Amendment (Count 2); and a claim under the Tennessee Government Tort Liability Act (TGTLA), Tenn. Code Ann. § 29-20-201 *et seq.* (Count 3).

Knox County moved for summary judgment, which the district court granted. It first determined that both the "before" and "after" Title IX claims failed because R.L. had not demonstrated that KCBE was deliberately indifferent to any "actionable harassment." (R. 71, PID 4079–83). The district court construed the constitutional claim as asserting two distinct theories of liability—one under the Fourteenth Amendment and another under § 1983. The court found that the Fourteenth Amendment claim failed for the same reason the Title IX claims failed—failure to show deliberate indifference. And the § 1983 claim failed because Student A—the person who

allegedly harmed R.S.—was a private actor not acting pursuant to an official policy or custom. The district court then held that the TGTLA claim failed because KCBE is immune from an "alternative" negligence claim arising from the same facts as the Fourteenth Amendment civil rights claim.

R.L. now appeals the dismissal of the Title IX and Fourteenth Amendment/§ 1983 claims.

## II. Standard of Review

"The court reviews *de novo* the district court's grant of summary judgment, applying the same standards as the district court." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making that determination, "the court views the evidence in the light most favorable to the nonmoving party." *Int'l Outdoor*, 974 F.3d at 697 (internal quotation marks omitted). Although the movant bears the burden of establishing that there are no genuine disputes of material fact, she can meet that standard by showing that the non-moving party lacks evidence to support an essential element of her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In sum, the non-moving party must present some "sufficient disagreement" that would warrant submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)). And "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Moreover, "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (internal quotation marks omitted).

### III. The Title IX Claims

"Title IX prohibits discrimination based on sex in any education program receiving federal funding." *S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*, 86 F.4th 707, 714 (6th Cir. 2023); 20 U.S.C. § 1681(a). Student victims of peer harassment whose harassers are "under the school's disciplinary authority" may bring two types of Title IX deliberate-indifference claims: "before" and "after" claims. *S.C.*, 86 F.4th at 714–15 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–67 (1999)).

A "before" claim is one in which "a student alleg[es] that a school's deliberate indifference *before* she was harassed caused the harassment." *Doe ex rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 465 (6th Cir. 2022). To succeed, a plaintiff must show:

> (1) that the school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) that indifference created a heightened risk of sexual harassment that was known or obvious, (3) the risk of harassment was in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school.

*S.C.*, 86 F.4th at 715 (internal quotation marks omitted); *see also Doe*, 35 F.4th at 466 ("'Before' claims require that more than a single incident of sexual misconduct occur to trigger liability … . Put differently, in a successful 'before' claim, a school's deliberate indifference to known past acts of sexual misconduct must have caused the misconduct that the student currently alleges." (citation omitted)).

A plaintiff bringing an "after" claim must show that the school: (1) has been "deliberately indifferent to sexual harassment," (2) "of which it has actual knowledge," and (3) which "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 619 (6th Cir. 2019) (cleaned up). The first prong does not require a school "to 'remedy' sexual harassment nor ensure that students conform their conduct to certain rules, but rather, the [school] must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (cleaned up); *see also id.* ("[C]ourts should not second guess the disciplinary decisions that school administrators make."). And "[a]ctual knowledge requires only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment." *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016).

For Title IX purposes, "'[s]evere' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass." *Kollaritsch*, 944 F.3d at 620. "Pervasive" not only refers to conduct that is "systematic" or "widespread" but also requires "*multiple* incidents of harassment; one incident of harassment is not enough." *Id.* (internal quotation marks omitted).[10] Finally, "'[o]bjectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Id.* at 621.

---

[10] The "same-victim requirement"—that there be further harassment or risk of further harassment against the same victim—that applies to "after" claims against universities does not apply to claims against high schools. *S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*, 86 F.4th 707, 713 (6th Cir. 2023).

On appeal, R.L. argues that she has two viable Title IX claims: the first arising from the events between September 2019 and March 2020, and a second based on the school's response after the May 2020 report that R.L. had been raped.

### A. Claims Based on Events Before March 2020

R.L.'s claims based on the events occurring before May 2020 do not establish a viable Title IX "before" claim because she has not shown that KCBE had actual knowledge of actionable sexual harassment. Before R.L. reported the March 2020 assault in May 2020, KCBE knew: (1) that R.L. had reported in September 2019 that R.S. had been kissed and (2) the concerns about Student A that R.L. claims to have raised at R.S.'s IEP meetings. A single kiss from 2019 is not actionable sexual harassment because "one incident" is not, by itself, "pervasive." *Kollaritsch*, 944 F.3d at 620. Therefore, neither R.L.'s report of the kiss nor her subsequently raised concerns about Student A created actual knowledge of actionable sexual harassment.

*Soper ex rel. Soper v. Hoben* reinforces that conclusion. 195 F.3d 845 (6th Cir. 1999). There, the student perpetrator kissed a minor student with intellectual disabilities, which the victim's mother reported to the school. *Id.* at 848–49. This court held that neither the initial report nor the mother's continued expressions of concern about the student perpetrator created actual knowledge of actionable harassment, even though the perpetrator went on to rape the disabled minor student. *Id.* at 849, 855.

So too here: R.L.'s September 2019 report did not create actual knowledge of actionable harassment. And R.L. has pointed to no other information, such as school disciplinary records demonstrating pervasive harassment in KCBE schools, that would have put KCBE on notice of actionable sexual harassment before R.L. reported the March sexual assault on R.S. in May 2020. *Compare Doe*, 35 F.4th at 466 ("As the disciplinary records cited by Jane Doe and Sally Doe

demonstrate, [the school system] was aware of issues with sexual harassment in the school system well before the two students reported their incidents. Many of these incidents [, like the harassment Jane Doe and Sally Doe experienced,] involved photos or videos."); *S.C.*, 86 F.4th at 715 ("Over one thousand instances of sexual misconduct at [Nashville-area] schools were documented during the 2016–2017 school year alone, with nearly 2,500 instances from 2012 to 2016."); *Pahssen ex rel. Doe v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 360 (6th Cir. 2012) ("While these were the only incidents cited by Appellant that involve [the victim], [the perpetrator] had a lengthy history of disciplinary problems, including several allegations of sexual harassment and assault, prior to his contact with [the victim].").

R.L. resists this conclusion, arguing that, unlike R.S. and R.L., the victim and her mother in *Soper* did not consider the kiss an assault. But *Soper* offers no support for that argument—the Title IX standard for harassment is objective. *See Kollaritsch*, 944 F.3d at 621. That argument therefore does not persuade.

R.L. also contends that "PMS administration and staff did not do a proper investigation," and that "Farley[] [had] prior knowledge of the perpetrator's identity." (Appellant's Br. at 21). But the undisputed facts show that PMS staff reviewed Student A's records, spoke with staff and students who might have seen interactions between R.S. and Student A, reviewed security-camera footage, and discussed the findings from all those steps with R.L. It is not clear what more KCBE should have done to conduct a "proper" investigation. And nothing in the record supports R.L.'s claim that Farley had prior knowledge of Student A's identity. *Supra* note 5.

Finally, R.L. argues that KCBE should have put additional "security measures in place to protect R.S." after the 2019 report. (Appellant's Br. at 21). But, as R.L. concedes, KCBE already had a policy in place to escort R.S. between classes and to the bathroom. (Appellant's Br. at 48

("Its simple resolve [sic] would have been to either escort or shadow R.S. to her classes and to the bathroom when necessary, a procedure that was already in place, but sometimes not followed.")). And R.L. never explains what other policies KCBE should have adopted to better protect R.S. Given KCBE's preexisting escort policy and the results of its investigation, R.L. has not shown that KCBE responded to the 2019 report in a way that was "clearly unreasonable," *Vance*, 231 F.3d at 260 (internal quotation marks omitted), by not adopting additional security policies.

## B. Claims Based on Events After May 2020

R.L.'s "after" claim similarly fails because she also has not shown that KCBE responded to her May 2020 report in a way that was "clearly unreasonable." *Id.* (internal quotation marks omitted). The undisputed facts show that KCBE spoke with law enforcement, reviewed security-camera footage, and developed a safety plan for R.S. while she was attending PHS. That plan, which R.S.'s IEP team created and modified over the course of several meetings, called for a teaching assistant to escort R.S. throughout the building, staff to signal to each other when handing off supervision of R.S., and administrators to put a "flag" in the scheduling system to prevent Student A and R.S. from being assigned to the same class. R.S.'s escort also began taking her on a different route to Phys. Ed. to avoid running into Student A during class transitions.

R.L. contends that KCBE should have taken different steps that put no responsibility on R.S., such as not asking R.S. to tell PHS staff if she saw Student A and altering Student A's route to lunch rather than altering R.S.'s route to Phys. Ed. But "[v]ictims do not have a right to particular remedial demands." *Id.* And even if KCBE's efforts once it had actual knowledge of actionable harassment were "ineffective," the concrete steps it took go well beyond "a [mere] string of verbal warnings" and are a far cry from "an official decision not to remedy the violation." *Foster v. Bd. of Regents of the Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020) (en banc) (cleaned

up). R.L. therefore has not met the "high bar" of showing that KCBE acted with deliberate indifference. *Stiles*, 819 F.3d at 848. As a result, her Title IX claims fail.

### IV. The Fourteenth Amendment/Section 1983 Claim

To bring a § 1983 claim against a governmental entity, a plaintiff must show (1) a constitutional violation, (2) directly caused by the governmental entity's policy or custom. *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017).

"Th[e Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948). Here, Student A—the person who allegedly assaulted R.S.—is a "private actor[], not [a] governmental or school official[] acting under color of state law or pursuant to governmental or school policies." *Soper*, 195 F.3d at 853. Although R.L. argued below that the IEP created a special relationship that imposed an affirmative duty on KCBE to protect R.S. from harm, she does not raise this argument on appeal. And, in any event, *Soper* forecloses this argument. *Id.* at 852–53. R.S. therefore has not shown a constitutional violation—a necessary part of her § 1983 claim.

R.L. also has not shown a policy or custom pursuant to which a constitutional violation occurred. "There are at least four avenues a plaintiff may take to prove the existence of a [governmental entity]'s illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may prove that a defendant has an actionable, unconstitutional "policy" or "custom" in place by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas*, 398 F.3d at 429).

On appeal, R.L. argues that she adequately pleaded her § 1983 claim because "Plaintiff's Complain[t] alleges and the evidence clearly establishes that the administrators and teachers at both PMS and PHS had no appreciable knowledge of the implications and responsibilities of Title IX." (Appellant's Br. at 52). She also argues that "Dr. Smith had no intention of enforcing the Restraining Order," which "showed intentional, deliberate indifference." (*Id.* at 53). Although R.L. does not couch those arguments in terms of the four avenues laid out in *Thomas*, they could potentially fit under the second, third, or fourth avenues.

R.L.'s arguments do not show ratification (avenue two) for purposes of § 1983 liability. There are two ways to show ratification: (1) when the governmental entity "fail[s] to meaningfully investigate and punish allegations of unconstitutional conduct," *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020), and (2) when an official with policymaking authority issues a final decision affirming a subordinate's decision, *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118–19 (6th Cir. 1994). *See also Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate."). As discussed above, KCBE investigated R.L.'s allegations, cooperated with the police investigation, which was inconclusive, and established procedures designed to protect R.S. So R.L. cannot show ratification under the first method. And, even if Smith were an official with final policymaking authority for § 1983 purposes (a proposition about which R.L. makes no arguments), R.L. points to no specific decision(s) that Smith allegedly ratified. Merely alleging in general terms that Smith had no intention of enforcing the restraining order does not establish ratification of illegal conduct.[11]

---

[11] In support of this argument, R.L. says that "[o]n five occasions during his deposition, when asked about obtaining a copy of the Restraining Order or implementing its enforcement, Smith stated 'not our responsibility.'"

R.L.'s arguments do not satisfy the third or fourth avenues, either. "A failure-to-train claim requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (cleaned up). Similarly, the "inaction" theory requires a plaintiff to show: (1) "a clear and persistent pattern" of rights violations; (2) "notice or constructive notice on the part of the [defendant]"; (3) "the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction"; and (4) a causal link between the defendant's custom and the constitutional deprivation. *Thomas*, 398 F.3d at 429 (alterations in original) (internal quotation marks omitted). Therefore, to succeed under either theory, R.L. needed to show a history of rights violations that would have put KCBE on notice. But. as discussed above, R.L. has not shown such a history. R.L.'s unsupported argument that Smith had no intention of enforcing the restraining order does not establish an official policy. And her assertion that PHS and PMS staff lacked knowledge of Title IX also does not establish a municipal policy under either the failure-to-train or "inaction" avenues, where the school established practices to avoid interactions between R.S. and Student A, and R.L. has not shown a clear and persistent pattern of rights violations.

---

Appellant's Br. at 54). But, read in context, these quotes do not show that Smith had no intention of enforcing the restraining order. For starters, Smith never said *enforcement* was not KCBE's responsibility. He simply said that it was not KCBE's responsibility to obtain a copy of a restraining order when the parties had not provided a copy. (R. 56-5, PID 2324 ("[I]f a court order is presented, we do enforce it. If there's one not presented, we have no grounds to enforce anything.")). He also testified that the same is true for any court orders regarding PHS students. (*Id.* at PID 2329 ("Q. … [C]an you prevent [a] [divorced] parent [subject to a no-contact order] from picking up their child without that court order [based on the other parent's phone call]? A. No. Q. Is Powell High School able to call the courthouse and get their own version of court documents? A. It's not our responsibility.")). And, as discussed above, R.L. has not otherwise shown that KCBE officials behaved with deliberate indifference.

In short, R.L. has not shown a municipal policy under any of the avenues laid out in *Thomas*. She therefore has not met her burden as to the second prong of her § 1983 claim.

**V.**

For the reasons set out above, we AFFIRM.